Joseph SAVINO, Jr., Ann Savino, Joseph Savino, Sr., International Preferred Risks, Inc. and Trans-Atlantic Insurance Company, Plaintiffs,

v.

E. F. HUTTON & CO., INC., Nicholas Tinios, Alan Grimaglia, Ted Adair, Alan Goldstein and Jerome H. Miller, Defendants.

No. 79 Civ. 2813.

United States District Court, S. D. New York.

Jan. 30, 1981.

---

Donald H. Shaw, P. C., New York City,
for plaintiffs; Donald H. Shaw, David Saft,
New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendants E. F. Hutton & Co., Inc., Ted Adair, Alan Goldstein, and Jerome H. Miller; Thomas F. Curnin, Thomas J. Kavaler, New York City, of counsel.

Sage, Gray, Todd & Sims, New York City, for defendant Nicholas Tinios; John F. X. Peloso, Stuart A. Krause, New York City, of counsel.

Hertzog, Calamari & Gleason, New York City, for defendant Alan Grimaglia; Peter F. Calamari, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs in this action seek damages for defendants' alleged violation of both the federal securities laws and common-law principles of fraud and fiduciary duty. Defendants are E.F. Hutton & Co., Inc. ("Hutton"), and five individuals who were employees of Hutton during the period when the events described in plaintiffs' amended complaint allegedly occurred. They move for an order dismissing the amended complaint, pursuant to either (1) Rule 9(b), Fed. R.Civ.P., for failure to allege fraud with the requisite particularity, or (2) Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. Alternatively, defendants move for an order, pursuant to Rule 12(f), Fed.R.Civ.P., striking those allegations in the amended complaint by which plaintiffs claim punitive damages and attorneys' fees. For the reasons hereinafter stated, defendants' motions are denied in all respects.

## BACKGROUND

The individual plaintiffs in this action are Joseph Savino, Jr. ("Savino Jr."), and his parents, Ann Savino and Joseph Savino, Sr. ("Savino Sr."). The corporate plaintiffs are International Preferred Risks, Inc. ("IPR"), a New York corporation, and Trans-Atlantic Insurance Company ("TAI"), a Bahamian corporation, both of which were owned and operated by Savino Jr. during the period of time relevant to this action. Plaintiffs filed their amended complaint in this action on August 11, 1980.[1] The amended complaint sets forth three causes of action, one based on the federal securities laws, the other two based on principles of common law and maintained before this Court under the doctrine of pendent jurisdiction. In the federal securities law cause of action, plaintiffs claim that defendants violated section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (1980), and section 17(a) of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. § 77q(a). Plaintiffs' first pendent cause of action claims that defendants' conduct constituted a common-law fraud, and their second pendent claim is based on defendants' alleged breach of fiduciary duty.

The events described in the amended complaint occurred between January 1, 1977 and June 30, 1978. During this period, defendant Jerome Miller was Hutton's Vice President in charge of East Coast operations, defendants Ted Adair and Alan Gold-

---

1. Plaintiffs filed their original complaint in this action on May 1, 1979. The original complaint set forth five causes of action, alleging violation of the federal securities laws, the rules of the National Association of Securities Dealers and the New York Stock Exchange, and common-law principles of fraud and fiduciary duty. Defendants moved to dismiss the original complaint, arguing that dismissal was warranted under (1) Rule 12(b)(1), Fed.R.Civ.P., because the Court lacked subject matter jurisdiction over the action; (2) Rule 12(b)(6), Fed.R.Civ.P., because the original complaint failed to state a claim upon which relief could be granted; and (3) Rule 9(b), Fed.R.Civ.P., because plaintiffs

failed to plead their allegations of fraud with the requisite particularity. The Court agreed with defendants' contention that plaintiffs had failed to comply with Rule 9(b), granted defendants' motion, and ordered dismissal of the complaint. *Savino v. E. F. Hutton & Co.*, 507 F.Supp. 1225 (RJW) (S.D.N.Y.1980). However, the dismissal was expressly made without prejudice to plaintiffs' filing a properly pleaded amended complaint within thirty days of the date of the Court's decision. Plaintiffs thereupon filed the amended complaint that is the subject of defendants' instant motions.

stein managed Hutton's White Plains office, and defendants Nicholas Tinios and Alan Grimaglia were employees of Hutton at its White Plains office.

The allegations of the amended complaint must be set forth in some detail. Plaintiffs' dispute with defendants concerns six accounts ("the Savino accounts") maintained by plaintiffs with defendant Hutton at its White Plains office. Each of the five plaintiffs held an account in his, her, or its name, while Savino Sr. and Ann Savino also held a joint account. The Savino accounts were opened on the following dates:

| Name of Account Holder | Date Account Opened |
| --- | --- |
| (1) Savino Sr. | May 1970 |
| (2) Savino Jr. | May 1970 |
| (3) Savino Sr. & Ann Savino | October 1974 |
| (4) IPR | October 1974 |
| (5) Ann Savino | October 1977 |
| (6) TAI | November 1977 |

Prior to 1977, the Savino accounts were managed by a Hutton employee named Michael Sposato. Sposato left Hutton in January 1977 to join the stock brokerage firm of Shearson Hayden Stone, Inc. ("Shearson"), at which time defendants Adair, Goldstein, Miller, and Grimaglia learned that Savino Jr., who throughout the period in question acted on behalf of all the holders of the Savino accounts, was considering transferring the funds invested in the four Savino accounts then in existence from Hutton to Shearson. The basic allegation of the amended complaint is that, commencing in January 1977 and continuing through June 1978, defendants misrepresented and omitted to state a number of material facts to Savino Jr. concerning the Savino accounts, with the goal of inducing plaintiffs to continue the Savino accounts at Hutton. Plaintiffs contend that they relied on these misrepresentations and omissions by continuing the Savino accounts at Hutton, and that by the time they finally liquidated the Savino accounts on June 20, 1978, they had suffered a loss in the Savino accounts of $375,000. They seek to recover this amount, plus interest, from defendants, and in addition ask that approximately $150,000 paid to defendants Hutton, Tinios,

and Grimaglia during this period as brokerage commissions be returned. Plaintiffs also claim, in connection with their pendent common-law claims, compensatory damages in the amount of $200,000 and punitive damages in the amount of $1,000,000. Finally, plaintiffs ask that they be awarded their attorneys' fees.

The amended complaint describes the following sequence of events: In January 1977, when Sposato left Hutton to join Shearson, the Savino accounts were assigned to defendant Grimaglia. Grimaglia was an account executive at Hutton whose activities were supervised by defendants Adair, Goldstein, and Miller. These defendants were all aware that Savino Jr. was considering closing the Savino accounts and transferring the funds invested therein to Shearson. Grimaglia telephoned Savino Jr. and asked that the funds invested in the Savino accounts not be transferred to Shearson until he and Savino Jr. could meet to discuss the matter. A luncheon meeting at the Railroad Club, in New York City, was arranged.

The Railroad Club meeting was held in January 1977. Savino Jr. and defendants Grimaglia, Adair, and Miller attended the meeting. These defendants made certain misrepresentations during the meeting. Specifically, they falsely represented that they intended (1) to discount commissions by thirty-five percent if the funds invested in the Savino accounts remained with Hutton; (2) to employ six to seven persons to handle the Savino accounts; (3) to employ tactics to stop losses; (4) to apply Hutton's research for the benefit of the Savino accounts; (5) to avoid unnecessary risk previously engaged in by Sposato; (5) to arrange for defendant Grimaglia to watch the accounts at all times; (6) to utilize automatic sell orders to avoid losses in excess of ten percent of the value of the portfolio; and (7) to limit plaintiffs' losses to a maximum of $50,000. In reliance upon these misrepresentations, Savino Jr. agreed to permit the funds invested in the Savino accounts to remain under Grimaglia's management at Hutton, with the exception of $100,000 to be transferred to Shearson.

During the Spring of 1977, Savino Jr. had a number of conversations with Grimaglia, Adair, and Goldstein, during which Savino Jr. expressed his concern over the losses plaintiffs were suffering. The losses were approaching ten percent of the total invested in the Savino accounts. Savino Jr. reminded these defendants that he was prepared to transfer the funds invested in the Savino accounts to Shearson. In an attempt to keep Savino Jr. from closing the Savino accounts, Grimaglia introduced him to defendant Tinios. Tinios, like Grimaglia, was an account executive at Hutton whose work was supervised by defendants Adair, Goldstein, and Miller.

The amended complaint describes two meetings between Savino Jr. and defendants Tinios and Grimaglia, both of which occurred in May 1977. Tinios and Grimaglia advised Savino Jr. that the funds in the Savino accounts should be reinvested in stock options, assuring him that options trading was no gamble and promising to watch plaintiffs' portfolio carefully every day. Based on this representation, Savino Jr. agreed not to close the Savino accounts, and to allow the funds therein to be reinvested in stock options. To insure that Tinios and Grimaglia would watch the Savino accounts properly, Savino Jr. agreed to pay them a bonus equal to ten percent of the profits on the Savino accounts.

Tinios promised to provide Savino Jr. with monthly written reports on the Savino accounts beginning in June 1977. In the reports for June, July, and August 1977, Tinios and Grimaglia falsely overstated the value of certain of the Savino accounts. Plaintiffs were unaware that the reports contained incorrect information, and relied on the false information by continuing to permit Tinios and Grimaglia to manage the Savino accounts. Plaintiffs also relied on these false statements by opening a fifth Savino account, in the name of Ann Savino, in September 1977, and by transferring funds invested with Shearson over to Hutton for distribution among the five Savino accounts in October 1977. The monthly reports continued to overstate the value of certain of the Savino accounts during September and October of 1977, which overstatement induced plaintiffs to open a sixth Savino account, in the name of TAI, during November 1977.

Tinios and Grimaglia made a number of false statements concerning the profits shown by the Savino accounts as of the end of 1977. On or about December 31, 1977, Tinios and Grimaglia informed plaintiffs that the Savino accounts had shown a profit of $111,000. In February 1978, they revised this figure downward to $63,487, at which point Savino Jr. paid Tinios and Grimaglia $6,500, representing the previously agreed upon ten percent bonus. The profit figure was subsequently recalculated in March 1978 to be $13,000, and in April 1978 to be $2,000. Shortly after the April recalculation, Tinios and Grimaglia returned the $6,500 bonus to Savino Jr. The Savino accounts actually showed a loss of $48,000 during the period in question. Tinios and Grimaglia were aware that the Savino accounts had shown such a loss when they stated to plaintiffs that a profit had been earned; plaintiffs relied upon the misrepresentations of Tinios and Grimaglia by permitting the Savino accounts to remain at Hutton.

The Savino accounts continued to suffer heavy losses during the first part of 1978. Tinios and Grimaglia concealed these losses from plaintiffs until April 18, 1978, on which date Tinios informed Savino Jr. that the losses in the Savino accounts amounted to $250,000. At that time, Tinios stated that the losses did not exceed $250,000, that steps would be taken to prevent further losses, and that Hutton intended to reimburse plaintiffs for their losses if the Savino accounts had actually shown a $48,000 loss rather than a $2,000 gain for the period ending December 31, 1977. These representations were false, and plaintiff relied on them by not immediately closing the Savino accounts. Not until May 1978, when Tinios met with Savino Jr. and told him that the losses in the Savino accounts would not exceed $330,000, did plaintiffs proceed to close the Savino accounts. The losses on the Savino accounts totaled $375,000.

Defendants have moved to dismiss the amended complaint. They argue that plaintiffs' federal securities law cause of action is insufficient in law and should accordingly be dismissed; the two state law causes of action should also be dismissed, they contend, because dismissal of the federal cause of action makes an exercise of pendent jurisdiction over the state claims inappropriate. In the alternative to their motions to dismiss the amended complaint, defendants move to strike those allegations in the amended complaint by which plaintiffs assert claims for punitive damages and attorneys' fees. The case is now before the Court on these motions.

## DEFENDANTS' MOTIONS TO DISMISS

Defendants urge alternative grounds in support of their instant motions to dismiss plaintiffs' federal securities law cause of action. First, they argue that the allegations of the amended complaint set out above fail to plead fraud with the requisite particularity, making the amended complaint insufficient under Rule 9(b), Fed.R. Civ.P. Second, defendants contend that those allegations are insufficient to state a claim upon which relief can be granted, so that the amended complaint fails to satisfy Rule 12(b)(6), Fed.R.Civ.P. These contentions are considered in turn below.

### I

Rule 9(b), Fed.R.Civ.P., states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." On May 20, 1980, the Court dismissed the original complaint filed in this action on the ground

that it did not satisfy the pleading requirements of Rule 9(b).[2] Defendants argue that the amended complaint is equally deficient under this rule. However, the Court is of the opinion that plaintiffs have, by the amended complaint, fully cured the inadequacies that the Court found in the original complaint. The Court accordingly rejects defendants' Rule 9(b) argument for dismissal.

Plaintiffs' federal securities law claims are founded on section 10(b) of the 1934 Act ("Section 10(b)"), Rule 10b–5, and section 17(a) of the 1933 Act ("Section 17(a)").[3] In order to state a claim under Section 10(b), plaintiffs must allege that (1) defendants misrepresented or omitted to state material facts in connection with the purchase or sale of a security; (2) plaintiffs relied to their detriment upon defendants' misrepresentations or omissions; and (3) defendants made their misrepresentations or omissions with "scienter," that is, with an intent to deceive, manipulate, or defraud plaintiffs. *See Lloyd v. Industrial Bio-Test Laboratories, Inc.*, 454 F.Supp. 807, 810 (S.D.N.Y.1978); *Weitzman v. Stein*, 436 F.Supp. 895, 902 (S.D.N.Y.1977). Since Section 17(a), like Section 10(b), sounds in fraud, similar allegations are required to state a claim under that section.[4]

Rule 9(b) essentially supplements these pleading requirements by imposing on plaintiffs a duty to make certain additional allegations. The rationale for Rule 9(b) is that, in cases involving fraud such as is alleged here, something more than the usual "short and plain statement of the claim"

---

2. See note 1 *supra*.

3. It is beyond peradventure that Rule 9(b) applies to complaints alleging violation of Section 10(b) and Rule 10b–5. *See, e. g., Credit & Finance Corp. v. Warner & Swasey Co.*, 486 F.Supp. 101, 106 (S.D.N.Y.1980). Since the elements of a claim under Section 17(a) are the same as those of a claim under Section 10(b), *In re Haven Industries, Inc.*, 462 F.Supp. 172, 181 (S.D.N.Y.1978), Rule 9(b) is undoubtedly also applicable to complaints alleging violation of Section 17(a).

4. The Court concludes that a private right of action exists under Section 17(a). See note 6 *infra*. As one court has stated, the Section 17(a) cause of action differs from the Section 10(b) cause of action only in that Section 17(a) prohibits fraudulent conduct in the *offer* or sale of any security, whereas Section 10(b) prohibits fraud in connection with the *purchase* or sale of any security. *In re Haven Industries, Inc., supra* note 3, 462 F.Supp. at 181 n.11. This distinction bears no relevance to the question of the applicability of Rule 9(b) to plaintiffs' amended complaint.

is necessary to be sure that "the defendant has been given 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Credit & Finance Corp. v. Warner & Swasey Co.*, No. 80–7294 at 1111–13, 638 F.2d 563, at 566–567 (2d Cir. 1981) (quoting *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444 (2d Cir. 1971)). To satisfy Rule 9(b), plaintiffs must allege facts stating the time, place, and nature of the misrepresentations or omissions for which each defendant is to be held responsible. *Brew v. Philips, Appel & Walden, Inc.*, [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,697, at 98,-665 (S.D.N.Y.1980); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1149 (S.D.N.Y.1979). Further, plaintiffs must allege some facts from which an inference of scienter can be drawn. *Ross v. A. H. Robins Co.*, 607 F.2d 545, 558 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The amended complaint alleges sufficient facts in both respects.

■ Whereas the original complaint filed in this action was deficient under Rule 9(b) largely because of its failure to provide sufficient details concerning defendants' alleged misrepresentations and omissions, the amended complaint, as described at some length above, is replete with names, dates, and places. It describes in detail the misrepresentations that were made and the manner in which they were misleading. Further, it states how plaintiffs relied on these misrepresentations, and explains the manner in which plaintiffs were damaged on account of this reliance. In the Court's view, then, the amended complaint fully apprises each defendant of the misrepresentations for which he or it is to be held liable, and also of the theory of that liability, that is, whether the defendant in question is charged as a principal or on a theory of secondary liability. The Court thus rejects defendants' vigorous contention that the amended complaint, while a cosmetic improvement on the original, does not cure the underlying deficiencies that the Court found in plaintiffs' former pleading. On the contrary, the Court is of the opinion that plaintiffs have conscientiously and successfully responded to the Court's prior decision by carefully supplying the necessary specifics at each point where the Court had earlier noted their absence.

■ The original complaint also failed to pass muster under Rule 9(b) because it contained no allegation from which an inference of scienter could be drawn. The Court rejects defendants' assertion that the amended complaint has not cured this deficiency. The scienter requirement means that facts showing an intent to defraud, a reckless disregard for the truth, or a knowing use of a device, scheme, or artifice to defraud must be pleaded to state a claim under the antifraud provisions of the federal securities laws. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1301 (2d Cir. 1973) (en banc); *accord, IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980). Here, plaintiffs have specifically alleged that defendants acted with an intent to defraud. Amended Complaint ¶¶ 28, 40, 66. The facts set forth in the amended complaint include allegations that defendants Tinios and Grimaglia, on repeated occasions during a period of almost one full year, misrepresented or omitted to state material facts to Savino Jr. in connection with the Savino accounts. These misrepresentations and omissions, if proven, would certainly be facts from which the Court could reasonably infer that defendants Tinios and Grimaglia acted with an intent to defraud or at least with a reckless disregard for the truth. First, the allegation that the misrepresentations were made pursuant to defendants' plan to deceive plaintiffs is, in the Court's view, tantamount to an allegation that the misrepresentations were made *knowingly*. Such an allegation, if proven, would clearly be sufficient to find an intent to defraud. *See IIT v. Cornfeld, supra*, 619 F.2d at 924. Second, a continuous pattern of misrepresentations would, even if no underlying plan were proven, support a conclusion that the misrepresentations were made with reckless disregard for the truth. As plaintiffs' counsel points out, it would be incredible to assert that Tinios and Grimaglia acted negligently for an entire year. Accordingly, plaintiffs have alleged facts from which the Court could infer the scienter required to award damages under the antifraud provisions of the federal securities laws.

In sum, the amended complaint passes muster under Rule 9(b) because, unlike the original complaint, it provides sufficient details concerning the nature of the alleged misrepresentations and states facts from which the Court could infer scienter.[5]

## II

Defendants urge two basic reasons why plaintiffs' federal securities law cause of action should be dismissed in whole or in part under Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. First, all defendants contend that this cause of action should be dismissed because defendants' alleged misrepresentations were not made in connection with the purchase, sale, or offer of a security. Second, defendants Hutton, Adair, Goldstein, and Miller argue that this cause of action must be dismissed insofar as they are concerned because they are not alleged to have made any relevant misrepresentations, and the amended complaint does not allege sufficient facts to state a claim against these defendants either as aiders and abettors or on a theory of vicarious liability. The Court views both arguments to be without merit, and accordingly must deny defendants' motion to dismiss plaintiffs' federal securities law cause of action under Rule 12(b)(6).[6]

## A

A claim will lie under Section 10(b) only if the alleged fraud occurred in connection

---

**5.** The Court does not propose to go through the entire amended complaint to show at each point how the amended complaint succeeds where the original complaint failed. One example will be noted, however, as a means of demonstrating the general point. As described above, an aspect of the alleged illegal conduct in this case involves certain representations made by defendants Tinios and Grimaglia to Savino Jr. after Savino Jr. informed certain of the defendants that he was again considering a transfer of the funds in the Savino accounts. The original complaint failed to allege when the first meeting between these three persons occurred, where it occurred, or who among the defendants made the representations in question. Moreover, the original complaint did not allege that the representations were false or explain how plaintiffs had relied on these representations to their detriment. The amended complaint, on the other hand, explains that the first meeting occurred during May 1977 at the office of Savino Jr. on East Gun Hill Road in Bronx, New York, and that the representations were made by defendants Tinios and Grimaglia. Amended Complaint ¶ 42. It further states that the representations made by these defendants at this meeting were false, and explains that plaintiffs relied on the misrepresentations by allowing the Savino accounts to remain at Hutton, which reliance damaged plaintiffs when the Savino accounts proceeded to lose money. Id. ¶¶ 47–48.

**6.** Defendants also raise a number of arguments for dismissal of the federal securities law cause of action under Rule 12(b)(6) that may be dealt with relatively briefly. First, plaintiff argues that the federal securities law cause of action should be dismissed insofar as it rests on Section 17(a), because a private right of action does not exist under that section. However, the rule in this Circuit is indisputably that Section 17(a) affords a private right of action. *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1038 (2d Cir. 1979) (as amended Jan. 14, 1980); *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir. 1978), *cert. denied*, 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979). The Supreme Court has consistently declined to pass on this issue. *See Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 1951, 66 L.Ed.2d 611 (1980); *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 557 n.9, 99 S.Ct. 790, 795 n.6, 58 L.Ed.2d 808 (1979); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 n.6, 95 S.Ct. 1917, 1924, n.6, 44 L.Ed.2d 539 (1975). The Court is well aware that recent Supreme Court pronouncements on private rights of action under the federal securities laws strongly indicate that the Supreme Court is disenchanted with the proliferation of such rights of action that resulted from the test announced in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). *See, e. g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) (no private right of action under section 206 of the Investment Advisers Act of 1940); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 579, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (no private right of action under section 17(a) of the 1934 Act). The Court is also aware that courts in other circuits, when writing on a clean slate, have recently been remarkably consistent in refusing to imply a private right of action under Section 17(a). *See, e. g., Ingram Industries, Inc. v. Nowicki*, [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,703, at 98,688 (E.D.Ky.1980); *Williams v. Nutritional Associates, Ltd.*, [1980] Fed.Sec.L. Rep. (CCH) ¶ 97,678, at 98,563–64 (W.D.Okla. 1980); *Martin v. Howard, Weil, Labouisse, Friedricks, Inc.*, 487 F.Supp. 503, 506–07 (E.D. La.1980); *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 652–53 (N.D.Cal.1980); *Demoe v.*

with the plaintiff's purchase or sale of a security. 15 U.S.C. § 78j(b); *see Blue Chip Stamps v. Manor Drug Stores, supra* note 6, 421 U.S. at 749, 95 S.Ct. at 1931–32 (holding

*Dean Witter & Co.,* 476 F.Supp. 275, 278 (D.Alaska 1979). However, this Court is not writing on a clean slate, and is constrained to follow the rule set forth in *Kirshner* unless and until either the Court of Appeals for this Circuit or the Supreme Court adopts a different rule. *Cf. Sennett v. Oppenheimer & Co.,* [1979–80] Fed.Sec.L.Rep. (CCH) ⸀ 97,378, at 97,504 (N.D. Ill.1980) (declining to hold that Section 17(a) created no private right of action in face of Seventh Circuit precedent to the contrary). *See also Leist v. Simplot,* 638 F.2d 283, at 316–318, (2d Cir. 1980), *cert. filed,* 49 U.S.L.W. 3388 (Nov. 12, 1980) (reaffirming, in face of Supreme Court decisions cited above, existence of a private right of action under the Commodity Exchange Act).

Defendants, apparently anticipating the Court's decision that a private right of action exists under Section 17(a), invoke section 11(e) of the 1933 Act, 15 U.S.C. § 77k(e), and argue that plaintiffs should be required to post a bond of $50,000 for the payment of the costs, including reasonable attorneys' fees, of this action. Section 11(e) of the 1933 Act provides in pertinent part that "[i]n any suit under [the 1933 Act] the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees." While section 11(e) speaks in terms of the court's "discretion," applications for undertakings have not generally been looked upon with favor, and the courts of this Circuit have viewed application of section 11(e) to require a specific finding that the action either was brought in "bad faith" or is so utterly lacking in merit as to "border on the frivolous." *See, e. g., Straus v. Holiday Inns, Inc.,* 460 F.Supp. 729, 732 (S.D.N.Y.1978). Defendants do not argue that plaintiffs have acted in bad faith. As is evident from today's decision, the amended complaint does not reveal plaintiffs' action, or any of the claims therein, to be so utterly lacking in merit as to border on the frivolous. Defendants have made no affirmative showing to this effect. Their request that plaintiffs be required to post a bond pursuant to section 11(e) is accordingly denied without prejudice to its renewal at such time as defendants are able to make such a showing.

Defendants make two additional arguments for dismissal of plaintiffs' federal securities law cause of action. First, they contend that no federal securities law claim is stated by the amended complaint because plaintiffs have not alleged that they acted with due diligence.

that plaintiff had no standing to maintain a private cause of action for money damages under Section 10(b) and Rule 10b–5 where plaintiff was neither purchaser nor seller of

There was at one time authority in this Circuit for a rule that a plaintiff must show that he or she acted with due diligence in order to make out a prima facie case under the antifraud provisions of the federal securities laws. *See, e. g., Hirsch v. du Pont,* 553 F.2d 750, 763 (2d Cir. 1977); *Rice v. Baron,* [1979–80] Fed.Sec.L.Rep. (CCH) ⸀ 97,200, at 96,583 (S.D.N.Y.1979); *Oleck v. Fischer,* [1979] Fed.Sec.L.Rep. (CCH) ⸀ 96,898, at 95,689 (S.D.N.Y.1979), *aff'd,* 623 F.2d 791 (2d Cir. 1980). However, the Court of Appeals has recently held that "a plaintiff's burden is simply to negate recklessness when the defendant puts it in issue, not to establish due care." *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 79 (2d Cir. 1980), *cert. denied,* 49 U.S.L.W. 3531, —— U.S. ——, 101 S.Ct. 938, 66 L.Ed.2d 109 (1981). Since plaintiffs herein thus will in no event have an obligation to *show* that they acted with due care, it is plain that they are not required to *allege* due care in order to state a claim.

Second, defendants contend that the doctrine of *in pari delicto* bars plaintiffs from recovering under the federal securities laws in this action, and hence requires dismissal of the federal securities law cause of action. Defendants invoke the doctrine on the basis of what they categorize as plaintiffs' admission in the amended complaint that the funds invested in the Savino accounts were, in part, unearned insurance premiums, which were consequently held in a fiduciary capacity. They urge that the investment of these funds in the Savino accounts thus violated N.Y.Ins. Law § 125. Even assuming the accuracy of defendants' reading of the amended complaint and of New York law, their invocation of the doctrine of *in pari delicto* is clearly meritless. The Court of Appeals for this Circuit has recognized that the doctrine of *in pari delicto* provides a defense to a federal securities law claim only when the plaintiff's reprehensible conduct is directly related to the subject matter of the litigation and the party seeking to invoke the defense was injured by such conduct. *Mallis v. Bankers Trust Co., supra,* 615 F.2d at 75. Here, defendants have not alleged how they were injured by plaintiffs' supposedly wrongful actions. Moreover, it is evident that these actions do not possess the requisite connection to the subject matter of the litigation, namely, the alleged misrepresentations by Tinios and Grimaglia in connection with the Savino accounts and the securities purchased and sold for those accounts.

security in question). Similarly, there is no claim under Section 17(a) in any given case unless the alleged fraud occurred in connection with the defendant's offer or sale of a security to the plaintiff. 15 U.S.C. § 77q(a). Thus, for plaintiffs herein to state a cause of action under either of the two provisions of the federal securities laws on which they rely, they must allege (1) the existence of a security which (2) plaintiffs purchased, sold, or were offered in connection with defendants' misrepresentations. Defendants argue that plaintiffs have not made such allegations.

### 1. Existence of a Security

[6] Contrary to defendants' argument, plaintiffs have successfully alleged that they purchased a "security" within the meaning of the federal securities laws. First, the common stocks and stock options that defendants purchased and sold for the Savino accounts undoubtedly constituted "securities" within the meaning of the federal securities laws.[7] 15 U.S.C. § 77b(1) (security defined under 1933 Act to include any "stock ... transferable share ... or warrant or right to subscribe to or purchase, any of the foregoing"); 15 U.S.C. § 78c(a)(10) (security similarly defined under 1934 Act); see Blue Chip Stamps v. Manor Drug Stores, supra note 6, 421 U.S.

at 751, 95 S.Ct. at 1932–33, ("puts, calls, options, and other contractual rights to purchase or sell securities have been recognized as [securities under the federal securities laws] because the definitional provisions of the 1934 Act themselves grant them such a status"). Second, the Savino accounts themselves constituted "securities" because they were "investment contracts" within the meaning of the relevant portions of the federal securities laws. See 15 U.S.C. §§ 77b(1), 78c(a)(10) (defining security under 1933 Act and 1934 Act to include "investment contract"). The Court's conclusion that the Savino accounts were investment contracts, being a point that the parties have hotly debated, is explained at some length below.

The question whether a discretionary brokerage account can constitute an "investment contract," and hence a "security," under the federal securities laws has been much mooted by the courts of this and other Circuits in recent years. Compare Darrell v. Goodson, supra note 7, [1979–80] Fed.Sec.L.Rep. at 97,325 (holding that plaintiffs' discretionary brokerage accounts did not constitute securities) with Troyer v. Karcagi, supra, 476 F.Supp. at 1147 (holding that plaintiffs' discretionary securities trading accounts constituted securities).[8] The

---

7. The instant case is thus far different from a number of the cases discussed below, which concerned discretionary commodities futures accounts. It is well settled that a commodity future itself is not a security under the federal securities laws. Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 622 F.2d 216, 221 (6th Cir. 1980), cert. filed, 49 U.S.L.W. 3053 (Aug. 9, 1980); Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1033 (2d Cir. 1974). In these cases, then, the only possible "securities" were the accounts for which the defendant broker executed the purchases and sales of the commodities. This is not the situation in the instant case, where both the Savino accounts themselves and the stocks and options purchased on behalf of the Savino accounts qualify as securities. Cf. Darrell v. Goodson, [1979–80] Fed.Sec.L.Rep. (CCH) ¶ 97,349, at 97,325–26 (S.D.N.Y.1980) (refusing to find that plaintiffs' discretionary brokerage accounts were securities, but holding that trades of individual securities in plaintiffs' accounts could satisfy requirement of purchase

or sale of security in connection with defendants' fraud).

8. See also Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc., supra note 7, 622 F.2d at 222 (holding that plaintiffs' discretionary commodities futures account did not constitute security); Brodt v. Bache & Co., 595 F.2d 459, 462 (9th Cir. 1978) (holding that plaintiffs' discretionary commodities trading account did not constitute security); SEC v. Continental Commodities Corp., 497 F.2d 516, 520–22 (5th Cir. 1974) (holding that plaintiffs' discretionary commodities accounts constituted security). For decisions of the district courts in this Circuit that, in addition to those cited above, discuss the issue, see, e. g., Alvord v. Shearson Hayden Stone, Inc., 485 F.Supp. 848, 853 (D.Conn.1980) (holding that discretionary stock option trading account constituted a security); Johnson v. Arthur Espey, Shearson, Hammill & Co., 341 F.Supp. 764, 765 (S.D.N.Y.1972) (holding that discretionary commodities account constituted a security); Berman v. Orimex Trading, Inc., 291 F.Supp. 701, 702 (S.D.N.Y.

Court of Appeals for this Circuit has not ruled on the issue. Those courts that have ruled on the issue agree on one point: Resolution of the question requires application of the Supreme Court's classic definition of an "investment contract" enunciated in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *See, e. g., Darrell v. Goodson, supra* note 7, [1979–80] Fed.Sec.L.Rep. at 97,325; *Troyer v. Karcagi, supra,* 476 F.Supp. at 1147.

The Supreme Court's opinion in *Howey* has generally been held to set forth a three-part test for determining whether a particular financial arrangement is an "investment contract," and hence is a "security," within the meaning of the federal securities laws. In the words of the *Howey* Court, "[t]he test is whether the scheme involves [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104.[9] Since the amended complaint alleges that the Savino accounts involved an investment of money and an expectation that profits would come solely from the efforts of defendants, there can be no doubt that the first and the third prongs of the *Howey* test are satisfied insofar as the Savino accounts are concerned. Defendants do not contend otherwise. The debate here concerns whether the Savino accounts constituted a "common enterprise," so as to satisfy the second criterion set forth in *Howey.*

The courts have generally agreed that there is a "common enterprise" within the meaning of *Howey* where the financial arrangement involves "horizontal commonality," that is, a relationship among investors whereby their monies or investment proceeds are pooled. *See, e. g., Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*

*supra* note 7, 622 F.2d at 222; *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274, 276–77 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). *See also Darrell v. Goodson, supra* note 7, [1979–80] Fed.Sec.L.Rep. at 97,325; *Troyer v. Karcagi, supra,* 476 F.Supp. at 1147. "Pooling" has been interpreted to refer to an arrangement whereby the account constitutes a single unit of a larger investment enterprise in which units are sold to different investors and the profitability of each unit depends on the profitability of the investment enterprise as a whole. *Milnarik v. M–S Commodities, Inc., supra,* 457 F.2d at 277–78 (quoting *Milnarik v. M–S Commodities, Inc.,* 320 F.Supp. 1149, 1151–52, 1153 (N.D. Ill.1970)). Thus, an example of horizontal commonality involving brokerage accounts would be a "commodity pool," in which investors' funds are placed in a single account and transactions are executed on behalf of the entire account rather than being attributed to any particular subsidiary account. The profit or loss shown by the account as a whole is ultimately allocated to each investor according to the relative size of his or her contribution to the fund. Each investor's rate of return is thus entirely a function of the rate of return shown by the entire account. *See Meredith v. Conticommodity Services, Inc.,* [1980] Fed.Sec.L. Rep. (CCH) ¶ 97,701, at 98,672 (D.D.C.1980).

The Savino accounts, as they are described in the amended complaint, were not "pooled" in this fashion, and accordingly were not "securities" under the horizontal commonality approach to *Howey's* common enterprise requirement. The money invested in each Savino account was not merged into a single investment fund. Rather, each Savino account constituted a separate fund to which particular transactions were

1968) (holding that discretionary commodities futures account constituted a security); *Maheu v. Reynolds & Co.,* 282 F.Supp. 423, 429 (S.D.N.Y.1968) (holding that a discretionary commodities futures account constituted a security).

9. The Supreme Court has consistently reaffirmed its language in *Howey. See, e. g., International Brotherhood of Teamsters v. Daniel, supra* note 6, 439 U.S. at 558, 99 S.Ct. at 795;

*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) ("[t]he touchstone [of an investment contract] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others").

attributed. The profitability of each plaintiff's account was purely a function of the transactions executed on behalf of that account, and was not *causally* related to the profitability of the Savino accounts as a whole. While the Savino accounts may have shown a similar pattern of losses because the defendants adopted a similar investment strategy towards each of them, the mere fact that the investment manager engaged in similar or even identical transactions on behalf of a number of accounts does not mean that these accounts were "pooled" in the sense required to find horizontal commonality. *See Milnarik v. M–S Commodities Inc., supra,* 457 F.2d at 276–77; *Meredith v. Conticommodity Services, Inc., supra,* [1980] Fed.Sec.L.Rep. at 98,672. Otherwise, any investment manager who adopted similar investment policies with respect to a group of his or her accounts would find each account in such a group converted into a security within the meaning of the federal securities laws.[10]

The failure of the Savino accounts to pass muster under the horizontal commonality approach does not necessarily mean that they do not satisfy *Howey's* common enterprise criterion. Some courts have stated that a common enterprise exists not only where there is horizontal commonality, but as well in a case of "vertical commonality."

The vertical commonality approach focuses on the relationship between the investor and the investment manager. The leading statement of what constitutes vertical commonality was rendered by the Court of Appeals for the Ninth Circuit in *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). There the court found a common enterprise where the financial arrangement was "one in which the fortunes of the investor [were] interwoven with and dependent upon the efforts and success of those seeking the investment." *Id.* at 482 n.7. The Ninth Circuit has recently further elucidated the meaning of vertical commonality with its decision in *Brodt v. Bache & Co., supra* note 8. There the court stated that no vertical commonality exists if "the success or failure of [the investment manager] does not correlate with individual investor profit or loss." 595 F.2d at 461. As the Court reads *Turner* and *Brodt,* they hold that there is "vertical commonality," and hence a "common enterprise" within the meaning of *Howey,* where the financial arrangement is such that the investment manager's fortunes rise and fall with those of the investor. *See Meredith v. Conticommodity Services, Inc., supra,* [1980] Fed.Sec.L.Rep. at 98,671.[11]

10. Even if the Court were to decide that the Savino accounts were a single account because, as a practical matter, they were treated as a unit by defendants, it would not be inclined to find horizontal commonality here. The Savino accounts might be viewed as a single account not because they constituted a single enterprise, but rather because the Savino family was, as a practical matter, a single investor. Thus, if one concludes that realistically speaking there was but one account, one must also conclude that there was but one investor, in which event there was still no pooling and hence no horizontal commonality.

11. A broader theory of vertical commonality than is adopted here was embraced by the Court of Appeals for the Fifth Circuit in *SEC v. Continental Commodities Corp., supra* note 8. The *Continental Commodities* court essentially made two points with respect to the *Howey* test. First, it regarded the third prong of *Howey* to be the most important, stating that the "critical factor is not the similitude or coincidence of investor input, but rather the uniform-

ity of impact of the promoter's efforts." 497 F.2d at 522 (quoting *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 478 (5th Cir. 1974)). Second, it expressly rejected the proposition that a pro-rata sharing of profits is a prerequisite to finding a common enterprise and satisfying the second component of *Howey.* 497 F.2d at 522. Instead, the court stated that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [investment manager's efforts]." *Id.* (quoting *SEC v. Koscot Interplanetary, Inc., supra,* 497 F.2d at 479). In other words, the court felt the second and third *Howey* elements could be treated by a single analytical approach in which "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." If the answer to this inquiry is affirmative, a court following *Continental Commodities* should find vertical commonality, satisfying *Howey's* second prong, and should also find that profits are expected to be derived solely from the efforts of others, satisfying *Howey's* third prong.

■ The Court agrees that a "common enterprise" should·be found to exist within the meaning of *Howey* where there is vertical commonality as described in *Turner* and *Brodt.* The test set forth in *Howey*, as the Court itself there stated, "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W. J. Howey Co., supra*, 328 U.S. at 299, 66 S.Ct. at 1103. By its terms, the common enterprise component of the *Howey* test states merely that the financial relationship that is to be labeled an "investment contract" must include two or more parties whose profits or losses are interdependent to a certain extent. Nothing in the language of *Howey* mandates that this relationship be horizontal, that is, between an investor and one or more other investors. The cases that have opted for horizontal commonality to the absolute exclusion of vertical commonality have not, in the Court's view, stated any convincing rationale for confining *Howey* in this manner.[12] It is plain enough that a vertical relationship, that is, a one-to-one relationship between the investor and the investment manager, is *capable* of being structured so that the profits and losses of the two parties are somehow interdependent. In the Court's opinion, such a structure is all that vertical commonality means under *Turner* and *Brodt,* and is all that *Howey* requires. Accordingly, the Court concludes that a common enterprise should be found where there is vertical commonality such as is described above.[13]

*Continental Commodities* is normally read to state a broad version of the vertical commonality approach, since it appears to hold that *any* discretionary brokerage account is a common enterprise within the meaning of *Howey*, even where the investment manager's income is derived solely from commissions and not at all from the relative success of the investor's account. See *Meredith v. Conticommodity Services, Inc., supra*, [1980] Fed.Sec.L.Rep. at 98,671. The Court notes that Judge Sweet of this Court has recently endorsed the vertical commonality approach as broadly stated in *Continental Commodities, see Troyer v. Karcagi, supra*, 476 F.Supp. at 1147–48, whereas Chief Judge MacMahon of this Court has, even more recently, expressly rejected this broad version of vertical commonality, *see Darrell v. Goodson, supra* note 7, [1979–80] Fed.Sec.L. Rep. at 97,325 n.8. In view of the Court's conclusion that the Savino accounts come within the narrower vertical commonality approach which is herein endorsed, the Court need not pass on the broader version which is currently the source of debate in this District. However, the Court is inclined to make a brief comment regarding the issue. Assuming that the courts have been correct in fastening on *Howey's* "common enterprise" language as an independent component in the test for the existence of an investment contract, the Court has little doubt that the broad version of vertical commonality is inconsistent with *Howey*. The problem with the broad approach under the prevailing reading of *Howey* was well stated in *Berman v. Bache, Halsey, Stuart, Shields, Inc.*, 467 F.Supp. 311, 319 (S.D.Ohio 1979), where Judge Kinneary remarked that

a finding of a common enterprise based solely upon the fact of entrustment by a single principal of money to an agent effectively excises the common enterprise requirement of *Howey*. The test would simply require (1) the investment of capital (2) with the expectation of profit through the efforts of others, for nothing more is involved in a single discretionary trading account.

Plainly, if the common enterprise component is indeed a full-fledged prong of the *Howey* test, it must be given some content. *Continental Commodities* fails to do so. On the other hand, the Court notes that the stipulated facts in *Howey* itself show that the case did not involve the type of profit-sharing that subsequent courts have so insistently required. *SEC v. W. J. Howey Co.*, 151 F.2d 714, 715–16 n.5 (5th Cir. 1945). One is left to wonder whether the *Howey* Court ever really intended for "common enterprise" to attain the status to which it has been elevated. *See* Note, *Discretionary Commodity Accounts as "Securities": Applying the Howey Investment Contract Test to a New Investment Medium*, 67 Geo.L.J. 269, 290–92 (1978) (arguing that *Howey* should not be read in this restrictive manner, and that all discretionary accounts should be viewed to satisfy *Howey* and hence to be securities).

12. Some courts seem to view the two approaches to be inherently mutually exclusive. *See, e. g., Curran v. Merrill Lynch, Pierce, Fenner, and Smith, Inc., supra* note 7, 622 F.2d at 222 ("[b]y adopting [horizontal commonality] we necessarily reject the vertical commonality approach"). Under the interpretation that the Court here gives to vertical commonality, no such necessary exclusivity exists.

13. Several courts that have rejected the broad version of vertical commonality discussed in note 11 *supra* have simultaneously, by way of

There can be no doubt that, under the allegations of the amended complaint, the Savino accounts involve vertical commonality of the type herein endorsed. Plaintiffs have specifically alleged that defendants Tinios and Grimaglia were to earn a bonus equal to ten percent of the profits shown by the Savino accounts. Amended Complaint ¶ 48. The Savino accounts were thus indeed structured so that the profits and losses of the investor (the holder of the particular Savino account) and the investment manager (Tinios and Grimaglia) were interdependent. Since vertical commonality is alleged here, the Savino accounts were a common enterprise within the meaning of *Howey* and the second prong of the *Howey* test is satisfied. There being no doubt that the Savino accounts meet the first and the third requirements of *Howey*, they are "investment contracts," and hence "securities," within the meaning of the federal securities laws.

### 2. Sale, Purchase, or Offer in Connection with Defendants' Misrepresentations

As noted above, in order to state a claim under either Section 10(b) or Section 17(a), plaintiffs must allege that the security in question was purchased, sold, or offered in connection with defendants' misrepresentations. Defendants contend that plaintiffs have not satisfied this requirement with respect to either of the two types of security at issue here, namely, the Savino accounts and the underlying stocks and options purchased and sold for the Savino accounts. Defendants' arguments, while meritorious in part, are insufficient to require dismissal of the amended complaint.

With respect to the Savino accounts, defendants suggest that their alleged misrepresentations merely induced plaintiffs to *retain* the Savino accounts, and thus argue that the Savino accounts cannot be said to have been purchased, sold, or offered in connection with defendants' fraud. Judge Sweet of this Court has recently held that a misrepresentation or omission that induces the "mere retention" of a discretionary brokerage account cannot form the basis of a claim under Rule 10b–5 because there can be no argument that the misrepresentation or omission induced the *purchase or sale* of a security. *Troyer v. Karcagi, supra*, 476 F.Supp. at 1148. The Court agrees with Judge Sweet's analysis, for it is entirely consistent with the reasoning of the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores, supra* note 6, 421 U.S. at 731, 95 S.Ct. at 1923, where the Court held that only actual purchasers or sellers of the security in question have standing to maintain an action under Rule 10b–5. The *Blue Chip Stamps* Court adopted this standard largely because a contrary rule "would throw open to the trier of fact many rather hazy issues of historical fact the proof of which depended almost entirely on oral testimony," and hence would place an unjustifiable burden on the court system relative to the benefit gleaned from allowing non-purchasers and non-sellers to bring suit under Rule 10b–5. *Id.* at 743, 95 S.Ct. at 1929. These problems of proof are as fully present in the instant context as they were in *Blue Chip Stamps*.

This result does not mean that the amended complaint wholly fails to state a claim under the federal securities laws on the basis of the Savino accounts. To a certain extent, each of the Savino accounts was "purchased" in connection with defendants' misrepresentations. First, the Court notes that two of the Savino accounts, those held in the names of Ann Savino and TAI, were opened in reliance upon misrepresentations and omissions made by Tinios and Grimaglia. Amended Complaint ¶ ¶ 57, 62. The opening of a new account constitutes

---

dictum, endorsed the narrower vertical commonality approach endorsed herein. *See, e. g., Meredith v. Conticommodity Services, Inc., supra*, [1980] Fed.Sec.L.Rep. at 98,671; *Mullis v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 492 F.Supp. 1345, 1352 (D.Nev.1980); *Darrell v. Goodson, supra* note 7, [1979–80] Fed.Sec.L.

Rep. at 97,325 n.8. *See also* Note, *Discretionary Accounts*, 32 U.Miami L.Rev. 401, 404–05 (1978) (arguing that there is an investment contract, and hence a security, where there is horizontal commonality or "narrow" vertical commonality, but not in cases of "broad" vertical commonality).

the "purchase" of a security where the account is an investment contract, *Troyer v. Karcagi, supra,* 476 F.Supp. at 1148, meaning that *Blue Chip Stamps* is clearly satisfied as regards these two Savino accounts. Second, the amended complaint alleges that defendants' misrepresentations and omissions induced defendants to invest additional funds in the other four Savino accounts, as well as in the Savino account held by Ann Savino. Amended Complaint ¶ 57. In the Court's view, the investment of additional funds in these Savino accounts constituted a "purchase" of a security to the extent of the amount of the funds invested, satisfying *Blue Chip Stamps* with respect to these funds. *See Troyer v. Karcagi, supra,* 476 F.Supp. at 1148 (each allegation of subsequent deposits of new funds in account constitutes a sufficient allegation of a "purchase" of an investment contract and hence of a security).[14] In sum, the amended complaint states a claim under the federal securities laws for plaintiffs' losses of (1) the funds originally invested in the two additional Savino accounts opened in the names of Ann Savino and TAI; and (2) any new funds invested in the Savino accounts subsequent to the date of the bonus agreement.

With respect to the underlying stocks and options traded by defendants on behalf of the Savino accounts, defendants argue that their alleged misrepresentations pertained only to the management techniques that would be applied to the Savino accounts, and not directly to the underlying securities that were to be bought or sold pursuant to these techniques. Defendants accordingly contend that the underlying securities were not purchased or sold "in connection with" defendants' alleged misrepresentations, and thus that no federal securities law cause of action is stated with respect to the underlying securities. The Court finds itself only in partial agreement with this argument.

Plaintiffs have indeed failed to allege any misrepresentations pertaining to the common stocks that were bought for the Savino accounts in January and February of 1977. However, as regards the stock options in which the Savino accounts were reinvested commencing in May 1977, the amended complaint alleges that defendants misrepresented the risk involved in investing in stock options, and that plaintiffs relied on this misrepresentation by allowing

---

**14.** The Court need not, and expressly does not, now decide whether the four original Savino accounts were "purchased" in connection with defendants' misrepresentations to the extent of the funds originally invested in these accounts. The question is an intriguing one. Under the narrow version of vertical commonality herein endorsed, the Savino accounts did not become "investment contracts," and hence "securities," within the meaning of the federal securities laws until the date of the bonus agreement between Savino Jr. and defendants Tinios and Grimaglia. Logically, the Savino accounts were not "purchased" within the meaning of the federal securities laws until they became "securities." Under the narrow version of vertical commonality, then, the four original Savino accounts were indeed "purchased" in connection with defendants' misrepresentations, at least to the extent of the funds invested in the Savino accounts as of the date of the bonus agreement.

However, under the broader version of vertical commonality discussed above, see note 11 *supra,* each of the four original Savino accounts became an "investment contract," and thus a "security," on the day it was opened. Each was thus "purchased," within the meaning of *Blue Chip Stamps,* before the period in ques-

tion and not in connection with any of defendants' misrepresentations. Under "broad" vertical commonality, these misrepresentations merely induced plaintiffs to *retain* the four original Savino accounts. In the Court's view then, the question whether the amended complaint states a claim under the federal securities laws with respect to plaintiffs' losses of the funds invested in the four original Savino accounts as of the date of the bonus agreement depends on whether the common enterprise component of the *Howey* test is satisfied only by the "narrow" vertical commonality that the Savino accounts involved after the bonus agreement, or also by the "broad" vertical commonality that each Savino account exhibited from the date it was opened.

Since the Court has independently concluded *supra* that the amended complaint states a federal securities law claim with respect to *some* of the funds invested in each of the six Savino accounts, the Court is not required to decide whether a claim is stated with respect to the funds originally invested in the first four Savino accounts in order to decide defendants' instant motions. As a result, the Court need not at the present time decide whether "broad" vertical commonality satisfies the common enterprise element of *Howey.*

the funds in the Savino accounts to be reinvested in stock options. Amended Complaint ¶¶ 42, 45, 47–49. This alleged misrepresentation pertained directly to the underlying securities bought and sold for the Savino accounts. The Court is well aware of the recent admonition by the Court of Appeals for this Circuit that "[n]ot every 'risky' investment rises to the level of fraud because the risk is insufficiently disclosed." *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir. 1978). The courts of this Circuit have accordingly declined to hold that a claim is adequately stated where the facts as alleged indicate merely that the defendant acted negligently in allowing the plaintiff to make a volatile investment. *See, e. g., Campo v. Shearson Hayden Stone, Inc.*, [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,517, at 97,-726 (S.D.N.Y.1980). On the other hand, a claim is stated where, as here, the defendants, knowing that the risk involved in an investment is unacceptable to the plaintiffs, allegedly deliberately misrepresented or omitted to state their opinion of the level of risk involved. *See, e. g., Alvord v. Shearson Hayden Stone, Inc., supra* note 8, 485 F.Supp. at 854 (misrepresentation of level of risk); *SEC v. American Institute Counselors, Inc.*, [1975–76] Fed.Sec.L.Rep. (CCH) ¶ 95,388, at 98,955 (D.D.C.1975) (omission to state of level of risk).

Since the amended complaint, subject to the limitations set forth in the preceding discussion, alleges that plaintiffs' losses resulted from defendants' misrepresentations made in connection with the purchase, sale, or offer of both the Savino accounts and the underlying stock options purchased and sold for those accounts, the two types of security at issue here, defendants' first argument in favor of a Rule 12(b)(6) dismissal must be rejected.[15]

## B

Defendants Hutton, Adair, Goldstein, and Miller make a second argument for dismissal of plaintiffs' federal securities law cause of action under Rule 12(b)(6). This argument is premised on the contention that this cause of action does not state a claim against these four defendants as principals. These defendants argue that dismissal is therefore warranted because the federal securities law cause of action also fails to state a claim against them either as aiders and abettors or on a theory of vicarious liability. The Court agrees that no claim is stated against these four defendants as principals. It finds, however, that plaintiffs have alleged sufficient facts to state a claim against these defendants on a theory of secondary liability. Defendants' second argument under Rule 12(b)(6) accordingly must be rejected.

The alleged misrepresentations that, if proven, would form the basis for defendants' liability under the federal securities laws were all made by defendants Tinios and Grimaglia.[16] Since defendants Hutton, Adair, Goldstein, and Miller thus engaged in no independent fraudulent conduct on which liability could be hinged, they may not be held liable as principals, and plaintiffs' recovery from these defendants must

---

**15.** The Court notes that the failure of plaintiffs' federal securities law cause of action to state a claim for certain losses that plaintiffs allegedly suffered does not mean that plaintiffs are thereby inevitably precluded from recovering those losses in the present action. Plaintiffs have also asserted two state law causes of action under the principles of pendent jurisdiction. These causes of action might provide a basis for recovering the damages that the federal securities law cause of action does not.

**16.** The amended complaint does allege that certain misrepresentations were made by defendants Adair, Goldstein, and Miller. Amended Complaint ¶¶ 29, 34. However, these alleged misrepresentations all occurred in connection with plaintiffs' decision to retain the Savino accounts at Hutton. None of them pertained to any of the underlying securities purchased and sold for the Savino accounts, or to any decision either to open a new Savino account or to invest more money in an existing Savino account. Under the analysis set forth above, then, plaintiffs may not invoke the federal securities laws as the bases for recovering any damages that they may have suffered as a result of these misrepresentations. These being the only misrepresentations allegedly made by defendants Adair, Goldstein, and Miller, these three defendants clearly may not be held liable as principals for violation of the federal securities laws.

be founded on a theory of secondary liability. *See Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 483 (2d Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980) (no liability as principal where defendant did not participate in allegedly fraudulent sales). Plaintiffs have made the alternative argument that these defendants are secondarily liable, either as "aiders and abettors" of Tinios and Grimaglia, or as "control persons" of Tinios and Grimaglia within the meaning of Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) ("Section 20(a)"). Since the Court agrees that the amended complaint states a federal securities law claim against defendants Hutton, Adair, Goldstein, and Miller under Section 20(a), it rejects their argument for dismissal of this cause of action.[17]

For these defendants to be held liable under Section 20(a), they must have "controlled" defendants Tinios and Grimaglia within the meaning of that section.[18] Congress deliberately avoided defining the term "control" when it passed the 1934 Act. *See* H.R.Rep.No.1783, 73d Cong., 2d Sess. 26 (1934). Traditionally, the meaning of "control" as used in Section 20(a) was a point of some confusion among the courts of this and other Circuits. *See generally* Comment, *A Comparison of Control Person Liability and Respondeat Superior: Section*

20(a) of the Securities and [sic] Exchange Act, 15 Cal.W.L.Rev. 152, 156–62 (1979); Note, *Vicarious Liability of Controlling Persons Under the Securities Acts*, 11 Loy. L.A.L.Rev. 151, 156–59 (1977). The difficulty arose from the so-called "good faith exception" contained in Section 20(a), under which a person charged pursuant to Section 20(a) ("the controlling person") escapes liability if it "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Some courts, viewing the good faith exception to be an affirmative defense, held that liability could be imposed under Section 20(a) merely if the alleged controlling person's *status* gave it the authority or power to control the conduct of the person primarily liable. *See, e. g., Lanza v. Drexel & Co.*, [1970–71] Fed. Sec.L.Rep. ¶ 92,826, at 90,102–03 (S.D.N.Y. 1970), *aff'd on other grounds*, 479 F.2d 1277 (2d Cir. 1973) (Section 20(a) requires only "some indirect *means* of discipline or influence," meaning that an individual could be held liable merely on basis of his status as president of company whose employee was liable as principal) (emphasis supplied).[19] Other courts viewed the good faith component to be a part of the plaintiff's case under Section 20(a), and hence refused to impose liability unless plaintiff showed that the alleged controlling person exercised ac-

---

**17.** The Court thus need not determine, for the purposes of deciding defendants' instant motion, whether a claim is stated against these defendants as aiders and abettors. It is sufficient at the present time to conclude that *some* claim sounding under the federal securities laws is stated against each defendant.

**18.** Section 20(a) reads as follows:
   Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
   15 U.S.C. § 78t(a).

**19.** *See also SEC v. First Securities Co. of Chicago*, 463 F.2d 981, 987 (7th Cir.), *cert. denied*,

409 U.S. 880, 92 S.Ct. 85, 34 L.Ed.2d 134 (1972) ("we have no doubt that [the defendant primarily liable], being the employee of [the Section 20(a) defendant] as its president, was 'controlled' by [the Section 20(a) defendant] within the intendment of section 20(a)"); *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) (Section 20(a) requires "only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable," meaning that " 'control' under the Act does not require knowledge of the specific wrongdoing"); *Harriman v. E.I. DuPont De Nemours and Co.*, 372 F.Supp. 101, 105 (D.Del. 1974) ("a plaintiff can state a cause of action under Sections 10b–5 and 20(a) of the [1934] Act without alleging any affirmative action on the part of the defendant .... '[S]tatus' may suffice if that status is such that it involves the potential for control").

*tual control* over the controlled person in relation to the transaction in question. To show "actual control," the plaintiff was required to prove the absence of good faith, that is, that the alleged controlling person knew or had reason to know of the controlled person's conduct. *See, e. g., Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 533 (S.D.N.Y.1977) ("[t]hose who neither know nor have reason to know of an agent's misdeeds are not liable as control persons").[20]

Today, however, it is fairly well agreed that proof of "control by status," as distinct from "actual control," is all that is required to make out a prima facie case under Section 20(a).[21] It has been said that proof of control by status creates a presumption of "control" within the meaning of Section 20(a), which presumption can be rebutted if the alleged controlling person proves an absence of actual control. *See* Comment, *supra*, 15 Cal.W.L.Rev. at 161. In the Court's view, the Court of Appeals for this Circuit adopted precisely this view with its recent decision in *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980),

*cert. denied,* —— U.S. ——, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). There the defendant proved that the person principally liable completed the fraudulent transactions through the defendant brokerage house, and that the defendant brokerage house received a commission on these transactions. *Id.* at 716. In other words, the defendant showed that the brokerage house had a *means* of controlling the principal's conduct, and thus proved what has herein been described as "control by status." The Court of Appeals held that this proof shifted the burden of proving "good faith" (that is, an absence of actual control) to the brokerage house. *Id.*

▮▮▮▮ In view of *Marbury Management's* statement that a prima facie Section 20(a) case requires only proof of control by status, it is plain to the Court that a plaintiff need only allege control by status in order to state a claim under Section 20(a). Here, there can be no doubt that the amended complaint adequately alleges "control by status" with respect to each defendant that plaintiffs seek to hold liable under Section 20(a). As regards defendant

**20.** *See also Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir. 1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976) (liability under Section 20(a) requires a showing of "culpable participation" by Section 20(a) defendant); *Lanza v. Drexel & Co., supra,* 479 F.2d at 1299 (intent of Congress in passing Section 20(a) "was obviously to impose liability only on those directors . . . who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons"); *Sennott v. Rodman & Renshaw,* 474 F.2d 32, 40 n.5 (7th Cir.), *cert. denied,* 414 U.S. 926, 94 S.Ct. 224, 38 L.Ed.2d 160 (1973) ("without bad faith or inducement there can be no liability under [Section 20(a)]").

**21.** *See, e. g., Paul F. Newton & Co. v. Texas Commerce Bank,* [1980] Fed.Sec.L.Rep. ¶ 97,-702, at 98,679 (5th Cir. 1980) (plaintiff made out prima facie case under Section 20(a) by showing that defendant possessed "power" to exercise control, shifting burden to defendant to show good faith); *Forman v. Ferro,* [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,676, at 98,560 n.9 (E.D.N.Y.1980) (corporation could be held liable under Section 20(a) merely on basis of its employment relationship with employee who was liable as a principal); *American General Insurance Co. v. Equitable General Corp.,* 493 F.Supp. 721, 752 (E.D.Va.1980) (defendants are

prima facie controlling persons under Section 20(a) when they possessed power to direct or cause the direction of the management and policies of primarily liable defendant); *In re Commonwealth Oil/Tesoro Petroleum Securities Litigation,* 484 F.Supp. 253, 269 (W.D.Tex. 1979) ("control" within meaning of Section 20(a) is "the power to direct or cause the direction of the management and policies of a persons"); *Troyer v. Karcagi, supra,* 476 F.Supp. at 1150 (brokerage firm could be held liable merely on basis of its status as employer of primarily liable employee); *Sharp v. Coopers & Lybrand,* 457 F.Supp. 879, 892 (E.D.Pa. 1978) ("control" under Section 20(a) depends on whether defendant "had the power or potential power to influence and control the activities of" controlled person); *Stern v. American Bankshares Corp.,* 429 F.Supp. 818, 823 (E.D. Wis.1977) ("[t]here is no requirement that the controlling person exercise control over the particular transaction which gives rise to the violation"). *See generally* Comment, *Secondary Liability of Controlling Persons Under the Securities Acts: Toward an Improved Analysis,* 126 U.Pa.L.Rev. 1345, 1351 (1978) ("[p]roof of actual use of [the controlling person's] control is not required to establish secondary liability under [Section 20(a)]").

Hutton, the amended complaint alleges that it was the employer of defendants Tinios and Grimaglia during the period in question. Amended Complaint ¶¶ 13, 14.[22] Further, construing it favorably to plaintiffs, the amended complaint alleges that defendants Tinios and Grimaglia completed the transactions for the Savino accounts through defendant Hutton, *see id.* ¶ 15, and that defendant Hutton received a commission on these transactions, *see id.* ¶ 27. These allegations, if proven, would unquestionably demonstrate control by status. *See Marbury Management, Inc. v. Kohn, supra,* 629 F.2d at 716; *Troyer v. Karcagi, supra,* 476 F.Supp. at 1150. As regards defendants Adair, Goldstein, and Miller, the amended complaint alleges control by status with its contention that these defendants occupied positions within Hutton's corporate structure that gave them the responsibility, and hence the means, of supervising the work of defendants Tinios and Grimaglia. Amended Complaint ¶¶ 16–18; *see Lanza v. Drexel & Co., supra,* [1970–71] Fed.Sec.L.Rep. at 90, 103.[23]

In sum, since the amended complaint states a claim against defendants Hutton, Adair, Goldstein, and Miller under Section 20(a), the Court must reject the second argument for dismissal of plaintiffs' federal securities law cause of action under Rule 12(b)(6).

## DEFENDANTS' MOTIONS TO STRIKE

Defendants also move, in the alternative to their motions to dismiss plaintiffs' federal securities law cause of action under Rules 9(b) and 12(b)(6), for an order pursuant to Rule 12(f), Fed.R.Civ.P., striking certain allegations contained in the amended complaint. Specifically, defendants urge that plaintiffs' claim for punitive damages and demand for attorneys' fees be stricken, on the ground that neither punitive damages nor attorneys' fees may be awarded to plaintiffs in this action. The Court disagrees with defendants on both points.

Plaintiffs, apparently recognizing that punitive damages may not be recovered under the provisions of the federal securities laws on which they rely,[24] assert a claim for $1 million in conjunction with their pendent common-law fraud claim.[25] Amended Complaint ¶ 96. Defendants' motions to strike this claim are based on the well-known language of the New York Court of Appeals in *Walker v. Sheldon,* 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 491, 179

**22.** The Court notes that the amended complaint is also sufficient to state a claim against defendant Hutton on a theory of respondeat superior. As the Court of Appeals for this Circuit has recently noted, where liability under the federal securities laws is purportedly based on respondeat superior, the question is simply whether the acts of the employee can fairly be considered within the scope of his or her employment. *Marbury Management, Inc. v. Kohn, supra,* 629 F.2d at 716. Plaintiffs have alleged that Tinois and Grimaglia at all times acted as employees of Hutton and that they accounted to Hutton for the transactions made on behalf of the Savino accounts. Amended Complaint ¶¶ 13–15, 27. Were these facts proven, they could form the basis for holding Hutton liable if Tinios and Grimaglia were found liable. *Marbury Management, Inc. v. Kohn, supra,* 629 F.2d at 716. The amended complaint thus states a claim against Hutton on a theory of respondeat superior even though it does not include the traditional conclusory allegation that Tinios and Grimaglia made the representations on which plaintiffs relied in the scope of their employment by Hutton. *Id.* at 711.

**23.** Indeed, it could be powerfully argued that plaintiffs have even alleged "actual control," by their contention that those defendants induced defendants Tinios and Grimaglia to make the misrepresentations on which plaintiffs detrimentally relied. Amended Complaint ¶¶ 28, 40, 66.

**24.** *Byrnes v. Faulkner, Dawkins & Sullivan,* 550 F.2d 1303, 1313 (2d Cir. 1977); *Green v. Wolf Corp.,* 406 F.2d 291, 302–03 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

**25.** Defendants have also urged the Court to dismiss plaintiffs' two state law causes of action on the ground that an exercise of pendent jurisdiction over these claims is inappropriate where, as defendants claim is the case here, no valid federal claim is stated. In view of the Court's conclusion that dismissal of the federal securities law cause of action is not warranted, it must reject defendants' argument for dismissal of the two state law claims.

N.E.2d 497, 499 (1961), wherein Judge Fuld wrote that "there may be a recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability." Insofar as defendants' motions to strike rest on an argument that the alleged conduct here was not "aimed at the public generally," they fail because recent New York cases demonstrate that this component of the *Walker* test is no longer a necessary prerequisite to an award of punitive damages in a fraud case. *See Borkowski v. Borkowski*, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 (1976); *Chase Manhattan Bank v. Perla*, 65 A.D.2d 207, 211, 411 N.Y.S.2d 66, 69 (4th Dep't 1978); *Greenspan v. Commercial Insurance Co. of Newark*, 57 A.D.2d 387, 389, 395 N.Y.S.2d 519, 520–21 (3d Dep't 1977). Today, then, to be entitled to an award of punitive damages, a plaintiff need only show that the fraud "[was] gross and involve[d] high moral culpability." Defendants argue that the conduct alleged in the amended complaint does not satisfy this standard. However, the Court believes that this is a question that is best resolved at trial, after plaintiffs have presented their proof on the issue. *See Banco National de Costa Rica v. Bremar Holdings Corp.*, 492 F.Supp. 364, 374 (S.D.N.Y.1980).

As regards plaintiffs' request for counsel fees, defendants correctly point out that attorneys' fees are not available under the 1934 Act. *See Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 553–54 (2d Cir. 1977). However, it is beyond doubt that section 11(e) of the 1933 Act, 15 U.S.C. § 77k(e), authorizes attorneys' fees to be awarded in certain circumstances to the prevailing party in an action maintained under the 1933 Act. *See, e. g., Miller v. Schweickart*, 413 F.Supp. 1059, 1062 (S.D.N.Y.1976) (awarding attorneys' fees under section 11(e) of 1933 Act to prevailing party in an action maintained under section 17 of 1933 Act). Here, plaintiffs have alleged that defendants violated section 17(a) of the 1933 Act, Amended Complaint ¶ 87, and the Court has concluded that a private right of action exists under that section, see note 6 *supra*. An award of attorneys' fees is thus

theoretically possible in the instant case. For such an award to be justified, the Court will have to find that one or more of the defenses raised by defendants bordered on the frivolous or was asserted in bad faith. *Aid Auto Stores, Inc. v. Cannon*, 525 F.2d 468, 471 (2d Cir. 1975). While the Court is not prepared to make such a finding at this point, it is not entirely confident that none of defendants' numerous defenses were either frivolous or asserted in bad faith. Accordingly, this issue, like the issue of punitive damages, must await the proof presented at trial.

### CONCLUSION

The amended complaint states a claim under the federal securities laws against each defendant. These claims are pleaded with sufficient particularity. Dismissal of the amended complaint is thus not warranted under either Rule 12(b)(6), Fed.R.Civ.P., or Rule 9(b), Fed.R.Civ.P. The allegations of the amended complaint are sufficient to support claims for punitive damages and for attorneys' fees, meaning that the portions of the amended complaint containing such claims should not be stricken pursuant to Rule 12(f), Fed.R.Civ.P. Defendants' present motions are accordingly denied in all respects. Discovery is to be completed by April 1, 1981, and a pre-trial order filed by May 1, 1981.

It is so ordered.