George W. HOLTZMAN, et
al., Plaintiffs,

v.

PROCTOR, COOK & CO., INC., et
al., Defendants.

Civ.A. No. 77–915–MC.

United States District Court,
D. Massachusetts.

Dec. 30, 1981.

John C. Wyman, Roche, Carens & DeGia-
como, Boston, Mass., for plaintiffs.

B. B. Denniston, III, Goodwin, Procter &
Hoar, Boston, Mass., for defendants.

Roscoe Trimmier, Jr., Ropes & Gray, Bos-
ton, Mass., for George N. Proctor.

## MEMORANDUM AND ORDER

McNAUGHT, District Judge.

This action was commenced on March 30, 1977, by several members of the Holtzman family against their former stock brokerage firms and principals of those firms. The complaint alleges that in April, 1971 a broker, then employed by Proctor, Cook & Co., sought accounts from the plaintiffs and made representations as to how he would handle those accounts. The plaintiffs seek to recover for losses which were allegedly caused by the fraud, breaches of contract and violations of various federal securities laws committed by the named defendants.[1]

The plaintiffs are George W. and Marion Holtzman, their sons George R. and Edward, and George's wife Barbara. The defendants are Proctor, Cook, a corporation which was dissolved as of December 12, 1973; Adams & Peck, a partnership which purchased certain of the assets of Proctor, Cook and which succeeded to plaintiffs' accounts in March, 1973; Braman B. Adams (now deceased) and James A. Bryant, two of the former partners of Adams & Peck; and George N. Proctor, a former director and shareholder of Proctor, Cook and a former partner in Adams & Peck.

Defendants have moved for dismissal of the complaint and/or for summary judgment. The parties have submitted the motions for consideration without a hearing. Since affidavits, answers to interrogatories, and a deposition have been submitted to and considered by the court, the motions are treated as motions for summary judgment.

## I. *Facts.*

In April of 1971, James M. Potts, a broker at Proctor, Cook, solicited the business of the plaintiffs. The plaintiffs opened various accounts with Potts allegedly in reliance on Potts' experience, his familiarity with the plaintiffs' financial picture, and his express oral agreement to invest conservatively and to limit losses to no more than 15% per year.[2]

The plaintiffs each executed a customer's agreement and a trading authorization vesting in Potts the discretionary power to invest plaintiffs' funds and property. The agreements do not mention the alleged representations of Potts.

The accounts of the plaintiffs suffered losses in the years after they were opened with Proctor, Cook. The combined accounts of George W. Holtzman declined in value from approximately $120,000 when they were opened to approximately $62,500 by March of 1973.

In March of 1973, Adams & Peck purchased certain of the assets of Proctor, Cook. The purchase agreement disclaimed assumption of any obligations or liabilities of Proctor, Cook except those set out in a schedule attached to the agreement. Plaintiffs' accounts were among those transferred to Adams & Peck, where they remained for nearly three more years. Adams & Peck retained the services of Potts for approximately one year after the transfer. Potts left Adams & Peck in the spring of 1974 and a Mr. Klauer took over the management of the plaintiffs' accounts.

In 1974 Klauer allegedly told Holtzman that the accounts were in good order and that he would keep a close watch over them. Relying on those assurances, it is claimed, Holtzman permitted Adams & Peck to retain management of the accounts. In a letter dated February 14, 1976, Holtzman informed the defendant Proctor that

1. Due to the Supreme Court's decision in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the plaintiffs, in their memorandum in opposition to these motions, have waived the claims in Counts VII, VIII, and IX of the complaint which had alleged violations of the Investment Advisors Act, 15 U.S.C. § 80b–1 *et seq.*

2. George and Marion Holtzman opened an account in April of 1971 to which they transferred securities and cash on several occasions during that year. The value of that account in October, 1971 was nearly $90,000. Mr. Holtzman opened a second account, for a trust of which he was the sole trustee, in the fall of 1971. At that time, the account was worth approximately $32,000. The Holtzman sons opened smaller accounts in that same time period.

the plaintiffs were making a claim and requesting arbitration under the rules of the New York Stock Exchange. The accounts were closed in the spring of 1978.

Throughout the period in which they had accounts with Proctor, Cook and Adams & Peck, the plaintiffs received confirmation slips whenever a transaction occurred in any of the accounts and monthly statements showing any transactions and listing the holdings in their accounts at the end of each month.

## II. *Claims of Plaintiffs.*

Plaintiffs' major allegations are that defendants, through the representations of Potts and by their own actions, committed fraud and violated various federal laws and rules and regulations of the Securities and Exchange Commission (S.E.C.) and of the New York Stock Exchange (N.Y.S.E.).

Count I charges common law fraud. Counts II and III allege breaches of contracts. Count IV appears to allege a violation of S.E.C. Rule 10b–5, 17 C.F.R. § 240, 10b–5. In Count V, plaintiffs allege that their accounts were "securities" and that Potts made untrue statements in the solicitation of those "securities" in violation of Rule 10b–5. Counts VI and XI also charge violations of Rule 10b–5 in that trading in the accounts when they were not registered as securities was a fraudulent and deceptive course of business. Count X charges that all defendants are derivatively liable for the alleged violations of securities law because they either knew or had reason to know of the illegal activities and participated therein. Finally, Count XIII[3] states a claim for a violation of N.Y.S.E. rules.

Plaintiffs seek recision of their contracts with Proctor, Cook, the return of all funds and property deposited with Proctor, Cook, plus interest, damages, costs and attorney's fees.

## III. *Motions to Dismiss And/Or for Summary Judgment.*

### (A) *Proctor, Cook & Co.*

**3.** There is no Count XII in the complaint.

■ Proctor, Cook & Co. was dissolved by decree of the Massachusetts Supreme Judicial Court on December 12, 1973. According to M.G.L. c. 156B, § 102,

"Every corporation whose corporate existence for other purposes is terminated . . . shall nevertheless be continued as a body corporate for three years after the time its existence is terminated, for the purpose of prosecuting and defending suits by or against it . . . provided, that the corporate existence of such a corporation, for the purposes of any suit brought against it prior to the commencement of, or during said period of three years, shall continue beyond said period for a further period of 90 days after the final judgment in the suit."

Since Proctor, Cook was dissolved on December 12, 1973, and this suit brought in March of 1977, the plaintiffs' action against Proctor, Cook is barred by Mass. General Laws c. 156B, § 102.

■ Plaintiffs' contention that they did not know of the dissolution of Proctor, Cook until 1976 does not aid their cause. M.G.L. c. 156B, § 102 is a statute mandating the survival of corporations for certain purposes; it is not a statute of limitations. Tolling principles are therefore inapplicable. *See Canadian Ace Brewing Co. v. Anheuser-Busch, Incorporated,* 448 F.Supp. 769 (N.D.Ill.E.D.1978), *aff'd* 601 F.2d 593 (7th Cir. 1979), *cert. denied* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 113 (1979). Further, Mr. Holtzman's statements in his letter dated February 14, 1976 (Bryant Affidavit, Exhibit I) indicate that he knew then that Proctor, Cook had been "taken over by Adams & Peck" and that he realized that "the statute of limitations will soon apply to any claim we may have against Proctor and Cook". (Bryant Affidavit, Exhibit I). Such knowledge on the part of Mr. Holtzman makes his delay in filing suit against Proctor, Cook unjustifiable, even apart from the provisions of the statute.

For these reasons, the plaintiffs' claims against Proctor, Cook were brought too

late, and the motion of Proctor, Cook for summary judgment must be granted.

### (B) *George N. Proctor*

■ Mr. Proctor argues that any claims arising out of his former status as a shareholder or director of Proctor, Cook must fail. Insofar as plaintiffs seek to impose upon Proctor whatever liability the corporation may have had, I agree with him.

Plaintiffs have neither alleged nor shown: (1) that the assets of Proctor, Cook prior to its dissolution were insufficient to satisfy their claims against it, (2) that Proctor so controlled the assets of Proctor, Cook as to work fraud upon them, (3) that Proctor continued the business of the corporation after its dissolution, or (4) that the dissolution of Proctor, Cook was an attempt to escape its alleged liability to plaintiffs. *See Gonzalez v. Progressive Tool & Die Co.,* 455 F.Supp. 363 (E.D.N.Y.1978) and 463 F.Supp. 117 (E.D.N.Y.1979).

In light of plaintiffs' knowledge of Proctor, Cook's status in February of 1976 and their failure to bring suit at that time, it would be unjust to impose the liability of Proctor, Cook upon Mr. Proctor.

Mr. Proctor should be held liable only for his own actions or omissions, if any. (See, however, discussion of statute of limitations at Part III. (D), *infra.*) Summary judgment, therefore, is allowed as to any claims seeking to impose "corporate" liability on defendant Proctor.

### (C) *Adams & Peck, Braman Adams, and James Bryant*

■ Defendants Adams, Bryant, and Adams & Peck argue that they are not liable as successors for the acts of Proctor, Cook prior to the purchase of the Proctor, Cook assets by Adams & Peck in March of 1973. Since there is no charge that Adams & Peck was involved in any of Potts' alleged representations in 1971 or any activity prior to March of 1973 and since Adams & Peck did not employ Potts until March of 1973, Adams & Peck, and Bryant and Adams, can be liable for pre–173 conduct only if it succeeded to the liabilities of Proctor, Cook as a purchaser of its assets. The purchase agreement between Proctor, Cook and Adams & Peck (Bryant Affidavit, Exhibit H) provides that Adams & Peck would not assume any obligations or liabilities which arose out of Proctor, Cook's conduct of its business except those listed in an exhibit to the agreement (chiefly contracts). The claims of the plaintiffs are not listed.

Plaintiffs argue that the liability of these defendants is based on the fact that Potts was employed by them and continued to affirm his alleged representations to the plaintiffs during that employment. Whether or not Potts continued after March 27, 1973, to affirm representations which he made in 1971, it is clear that, absent some assumption, either express or implied, by Adams & Peck of the liability of Proctor, Cook, Adams & Peck is not liable for any alleged fraud or misrepresentation on the part of Potts until his employment by Adams & Peck in March of 1973.

For these reasons, summary judgment must be granted to the defendants Adams & Peck, Adams, and Bryant for all claims arising prior to Potts' employment with Adams & Peck in March, 1973.

### (D) *Statute of Limitations*

The parties are *in agreement* that the applicable statute of limitations governing the fraud counts of the complaint and those counts alleging violations of S.E.C. Rule 10b–5 is M.G.L. c. 260, § 2A. That statute provides a two-year limitations period for causes of action arising before January 1, 1974, and a three-year period for those arising thereafter. *See Janigan v. Taylor,* 344 F.2d 781 (1st Cir. 1965), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).

■ To determine when causes of action accrue and when tolling principles apply, federal common law must be applied. *Cook v. Avien,* 573 F.2d 685, 694 (1st Cir. 1978); *Janigan v. Taylor, supra,* at 784. Under federal law, "a federal cause of action will accrue at the time when plaintiff in the exercise of reasonable diligence dis-

**14**

covered or should have discovered the fraud of which he complains". *Cook v. Avien, supra,* at 695.

■ The burden is on the plaintiffs to establish that they have complied with the statutes of limitations. *Sleeper v. Kidder, Peabody & Co., Inc.,* 480 F.Supp. 1264, 1265 (D.Mass.1979) *aff'd* 627 F.2d 1088 (1st Cir. 1980). In a letter dated February 14, 1976, George W. Holtzman contends that certain information provided by Potts at the end of 1972 or in 1973 was the first indication which the plaintiffs had that they had suffered a loss of $100,000.[4] Plaintiffs contend that this letter contradicts the argument of the defendants that the receipt by the plaintiffs of confirmation slips and monthly trading statements constitute knowledge and comprehension of their contents. Plaintiffs further assert that Potts, through March of 1974, continued to affirm his original representations as to how he would conduct their accounts. In addition, plaintiffs contend that in 1974 Paul Klauer, who managed their accounts when Potts left Adams & Peck, represented to them that their accounts were in good order and that he would keep a close watch over them.

The confirmation slips and the monthly account statements sent to the plaintiffs should have alerted reasonable persons to the possibility that their accounts were not being managed as they had anticipated. Simply by comparing confirmation slips regarding purchases and sales of the same stock, plaintiffs would have known what losses they had incurred. The same type of comparison of monthly statements would have given similar information.

In his letter of February 14, 1976, and in his answers to interrogatories, George Holtzman indicates that by the end of 1973 he knew of losses exceeding $100,000 in the accounts of the plaintiffs. He was also aware in February of 1976 that whatever claim he had against Proctor, Cook would soon be barred. Yet suit was not filed until March of 1977.

■ Regardless of when Mr. Holtzman asserts that plaintiffs first discovered the alleged fraud, by reasonable diligence it should have been discovered by the end of 1972 or 1973 by making the computations of which plaintiffs display knowledge in their answers to interrogatories (Nos. 33–36). As the First Circuit has stated, "the exercise of reasonable diligence *requires* (Emphasis supplied) an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention ∴ (E)ven where facts are fraudulently withheld a plaintiff cannot be allowed to ignore the economic status of his or her investment." *Cook v. Avien, supra,* at 698. That, apparently, is what the plaintiffs did; therefore, their claims of fraud occurring prior to March 30, 1974 are barred by the statute of limitations.

(E) *Plaintiffs' Accounts as "Securities"*

Several of the plaintiffs' claims depend upon their accounts being construed as "securities" within the meaning of the federal securities laws. Plaintiffs contend that defendants failed to register their accounts as securities, made untrue statements of material fact, omitted material facts in soliciting their accounts, and traded in those accounts when they were not registered as "securities".

■ Plaintiffs assert that the customers' agreements and trading authorizations which they executed constituted investment contracts under 15 U.S.C. §§ 77b(1) and 78c(a)(10).[5]

---

4. It is unclear from the context of the letter whether plaintiffs had the information in 1972 or in 1973. In their answers to interrogatories, however, plaintiffs assert that by late 1973 their accounts had decreased by approximately $100,000.

5. 15 U.S.C. § 77b(1) provides:
   (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, cer-

The determination of whether or not the discretionary brokerage accounts constitute an investment contract, and thus a "security", requires application of the three-part test enunciated in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). There the Court held that, "the test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104.

That seemingly clear-cut test has engendered a plethora of decisions concerning whether discretionary trading accounts meet the *Howey* definition. The decisions are far from consistent. The major area of difference among the courts deciding the issue is the element of commonality required by *Howey.* That is also an area of dispute in this suit.

Two approaches have been taken by courts in interpreting this commonality requirement. One line of cases holds that the "common enterprise" element of the *Howey* definition requires that there be "horizontal commonality" or a pooling of the interests of investors. *See, e.g., Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972); *Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 622 F.2d 216 (6th Cir. 1980) (and cases collected therein in footnote 5, pg. 222).

The other line of cases holds that the commonality requirement is met by "vertical commonality", that is, where the arrangement is "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment". *SEC v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir. 1973). *See also SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974) and *Savino v. E. F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1237 n. 11 (S.D.N.Y.1981).

The court in *Savino* espoused a narrower "vertical commonality" than that adopted in *SEC v. Continental Commodities Corp., supra. Savino* held that a "common enterprise" could be found "where the financial arrangement is such that the investment manager's fortunes rise and fall with those of the investor". *Savino, supra,* at 1237. Finding that the defendants in that case would receive a bonus of ten percent of the profits shown by the plaintiffs' accounts, the *Savino* court found that "vertical commonality" existed and held that the accounts constituted an investment contract.

Research has revealed no cases within this Circuit that have decided the issue one way or the other. While I feel that "horizontal commonality" is what is required by the decision in *Howey*, I conclude that the arrangement between the plaintiffs and the defendants meets neither commonality test.

The discretionary accounts at issue here were individual accounts. The funds were not pooled into a single investment fund. There was no sharing of either the profits or the risks. The fact that many of the transactions in the various Holtzman accounts involved identical stocks does not constitute the required commonality. What the court in *Savino* said of the Savino fami-

tificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

and § 78c(a)(10) states:

(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

ly accounts is true of the Holtzman family accounts at issue here: "While the Savino accounts may have shown a similar pattern of losses because the defendants adopted a similar investment strategy towards each of them, the mere fact that the investment manager engaged in similar or even identical transactions on behalf of a number of accounts does not mean that these accounts were 'pooled' in the sense required to find horizontal commonality." *Savino v. E. F. Hutton & Co., Inc., supra*, at 1237.

I reject the broader view of "vertical commonality" as adopted by the Fifth Circuit in *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974) for the reason that it eliminates the common enterprise element from the *Howey* test. *See Berman v. Bache, Halsey, Stuart, Shields*, 467 F.Supp. 311, 319–320 (S.D.Ohio E.D. 1979).

The plaintiffs' accounts do not meet the narrower version of "vertical commonality" espoused by the court in *Savino v. E. F. Hutton & Co., Inc., supra*. There is no indication that the agreements between the plaintiffs and the defendants were such that the profits and losses of the parties are in any way interdependent.

For the foregoing reasons, plaintiffs' accounts are not securities within the meanings of either 15 U.S.C. § 77b(1) or § 78c(a)(10) and summary judgment must be granted to defendants on those claims dependent on the accounts being so defined.

### (F) *Violations of N.Y.S.E. Rules*

Count XIII appears to allege violations of rules of the N.Y.S.E. (particularly Rule 405, the "Know Your Customer" rule) enacted pursuant to § 6(b) of the Securities Exchange Act, 15 U.S.C. § 78f(b).

The Securities Exchange Act does not expressly authorize private causes of action for alleged violations of stock exchange rules. In order to imply such a cause of action, the standards enunciated by the Supreme Court in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) and *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11,

100 S.Ct. 242, 62 L.Ed.2d 146 (1979) must be met. In *Touche Ross, supra*, the Court, in holding that there was no cause of action under § 17(a) of the Securities Exchange Act (which requires brokers to keep whatever records the SEC may require), stated "... our task is limited solely to determining whether Congress intended to create the private right of action..." 442 U.S. at 568, 99 S.Ct. at 2485.

In the present case, the rules were not promulgated by Congress but rather by the New York Stock Exchange, pursuant to Congressional authorization. Section 6(b) "neither confers rights on private parties nor prescribes any conduct as unlawful". *Touche Ross, supra*, at 569, 99 S.Ct. at 2485–86. There is nothing in the legislative history of the Act which even suggests that a private cause of action can be implied under § 6(b).

The mere fact that § 6(b) may protect the public does not provide a basis for implying a private cause of action. *See Touche, Ross, supra*, at 578, 99 S.Ct. at 2490; *Transamerica, supra*, 444 U.S. at 24, 100 S.Ct. at 249; *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 680–681 (9th Cir. 1980).

For those reasons, I hold that there is no private cause of action under § 6(b) of the Securities Exchange Act and that Count XIII must be dismissed.

### (G) *Breaches of Contracts* (Counts II and III)

The resolution of the dispute regarding the written and alleged oral contracts involves determinations of genuine factual issues. Since that is so, the resolution should be made only after the taking of evidence. Accordingly, defendants' motions for summary judgment, as they relate to the contract issues, must be denied.

### IV. *Conclusion.*

The motions for summary judgment, therefore, are allowed in part and denied in part consistent with the reasons set forth in Part III, *infra*, of the Memorandum and Order.