Neville KAPLAN and Ann Boehm Kaplan, Plaintiffs,

v.

Hyman R. SHAPIRO, Individually, and .Norman Karp and Ruth F. Shapiro, Individually and as Trustees under a Trust for the Benefit of Ruth F. Shapiro, Defendants.

83 Civ. 8810 (SWK).

United States District Court, S.D. New York.

March 7, 1987.

Eileen West, White Plains, N.Y., for plaintiffs.

Tenzer, Greenblatt, Fallon & Kaplan by Edward L. Sadowsky, Harris N. Cogan, Marc J. Kurzman, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action is brought under Section 17(a) of the Securities Act of 1933, as amended,

15 U.S.C. § 77q(a); Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; Section 352–c of the New York General Business Law, and common law principles of fraud and contract. Plaintiffs allege that defendants fraudulently induced plaintiffs to invest $150,000 in four of defendants' real estate projects, in violation of federal securities laws and New York statutory and common law principles. The case presently is before the Court on defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted.

## FACTS

The following facts are not in dispute. Plaintiffs and defendants are residents of New York State. Plaintiff Neville Kaplan is a radiologist, and defendant Hyman Shapiro is an attorney. Neville Kaplan and Hyman Shapiro had been friends for many years and had been in regular contact since approximately 1964. Since approximately 1973, Neville and Ann Kaplan have met regularly with Hyman and Ruth Shapiro on a social basis.

Defendants Norman Karp and Ruth Shapiro are the trustees of the Ruth Shapiro Trust. The Ruth Shapiro Trust is (1) a 50% partner with Robert Olnick Associates in a partnership known as Roc-Soho Associates, which owned 599 Broadway; (2) a 50% partner with Robert Olnick Associates in Roc-Charles Associates, which owned 151–7 Charles Street; and (3) a 33⅓% partner with Robert Olnick Associates in Roc-Castleton Associates, which owns the Staten Island Hospital property. Ruth Shapiro individually is a 33⅓% stockholder of 80 Warren Realty Corporation, a subchapter-S Corporation which owned the 80 Warren Street property.

On or about January 15, 1979, after discussions with Hyman Shapiro regarding possible real estate investments, the Kaplans paid Norman Karp and Ruth Shapiro as the trustees for the Ruth Shapiro Trust, and Ruth Shapiro individually, the total sum of $100,000 for a 5% interest in properties known as 599 Broadway, 151–7 Charles Street, and 80 Warren Street, in New York City. The Kaplan's check was made payable to "Norman Karp and Ruth Shapiro as Trustees f/b/o Ruth Shapiro."

Plaintiffs made two additional payments by check to "Norman Karp and Ruth Shapiro as Trustees," one of $30,000 dated April 30, 1979 and the other of $20,000 dated May 15, 1979. The additional $50,000 was intended as an investment in a property located at 512 Broadway in New York City. However, by letter dated May 29, 1979, Hyman Shapiro advised the Kaplans that the proposed deal at 512 Broadway had not materialized, and requested the Kaplans consent to apply the additional $50,000 investment to another property, the Staten Island Hospital property. When Hyman Shapiro did not receive any response to his May 29th letter, he again contacted the Kaplans by letter dated June 15, 1979. The Kaplans did decide to apply the $50,000 investment to the Staten Island Hospital property instead.

Neither the Shapiros nor Norman Karp have ever sold any participation in the Ruth Shapiro Trust's or Ruth Shapiro's interest in Roc-Soho Associates, Roc-Charles Associates, Roc-Castleton Associates or 80 Warren Realty Corporation to any individual or entity other than the Kaplans. However, Neville Kaplan had invested with Hyman Shapiro on two prior occasions in other real estate projects, one of which had proven to be a successful tax shelter for Dr. Kaplan, while the other project had not worked out. Hyman Shapiro apparently had returned Neville Kaplan's initial investment in the unsuccessful real estate venture.

The Kaplans make numerous allegations, both in their complaint and in their papers opposing defendants' motion for summary judgment. They claim that they had been looking for a "safe" investment to serve as their retirement fund, that they explained this to Hyman Shapiro, that he told them that he would put together an investment package which met their needs, and that the investments which they ultimately

made would make money. The Kaplans claim that they were led to understand that there was no risk of loss involved in these investments, not only in terms of their initial $150,000 investment but also in terms of any additional loss sustained should the real estate ventures not succeed. In short, the Kaplans claim that this was to be a foolproof investment and that they could only make money.

The Kaplans claim that they became increasingly concerned over the status of their investments, that they then requested an accounting on numerous occasions, that defendants failed to provide such an accounting, and that they finally initiated this action for fraud when they were told that one of the investment properties was losing money and that they owed defendants a percentage of these losses.

## DISCUSSION

The first issue to consider is whether plaintiffs have subject matter jurisdiction to bring their claims in federal district court.

■ In order for this court to exercise jurisdiction over plaintiffs' federal claims brought under the Securities Act of 1933, the Securities Exchange Act of 1934, and Rule 10b–5, the transaction involved must be a "security" as defined in both the 1933 and 1934 Acts. Section 2(1) of the 1933 Act provides

When used in this subchapter, unless the context otherwise requires—(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of or

warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b. Section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), is its equivalent. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 556 n. 7, 99 S.Ct. 790, 795 n. 7, 58 L.Ed.2d 808 (1979).

Plaintiffs and defendants agree that, if the transaction involved is a security, it could only be an "investment contract". *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), contains the classic definition of an "investment contract":

[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person ■ invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of a promoter or third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298–99, 66 S.Ct. at 1102–03.

The three prong *Howey* test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. at 1103. It is not disputed that the plaintiffs in this case invested money. Nor can it be disputed that plaintiffs were led to expect profits solely from the efforts of others, including Hyman Shapiro. Therefore, the first and third prongs of the *Howey* test are satisfied.

Whether plaintiffs invested money in a "common enterprise" is less clear cut, however. Courts are divided on which of two basic approaches to apply, or whether to apply both, in determining whether an investment satisfies the common enterprise prong of the *Howey* test. Some courts have applied "horizontal commonality", others have adopted "vertical commonality", and some use both approaches.

■ Courts espousing a theory of horizontal commonality require plaintiff to

show a pooling of the investors' interests in order to establish a common enterprise. *See, e.g., Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 682 F.2d 459, 460 3d Cir.1982); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.2d 216, 222 (6th Cir.1980), *aff'd on other grounds,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Milnarik v. M-S Commodities,* 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). In other words, the horizontal commonality approach requires that the fortunes of each investor in a pool of investors be tied to the success of the overall venture, i.e., a sharing or pooling of funds. *In re Energy Systems Equipment Leasing Securities Litigation,* 642 F.Supp. 718, 735 (E.D.N.Y.1986).

There is a split among those courts that have applied the vertical commonality approach. The more restrictive approach, which was first enunciated by the Ninth Circuit, holds that vertical commonality exists where "the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or third parties." *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The Ninth Circuit requires merely that there be a "direct relation between the *success or failure* of the promoter and that of his investors." *Mordaunt v. Incomco,* 686 F.2d 815, 817 (9th Cir.1982) (emphasis added), *cert. denied,* 469 U.S. 1115, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985). However, absent such a direct relationship, vertical commonality will not be held to exist. *Mechigian v. Art Capital Corp.,* 612 F.Supp. 1421, 1426 (S.D.N.Y.1985).

The Fifth Circuit has articulated a broader interpretation of the vertical commonality approach and held that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter's efforts]." *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 479 (5th Cir.1974). Rather than requiring a tie between the fortunes of the investors and the *fortunes* of the promoters, as is necessitated under

the restrictive approach to vertical commonality, the broader definition merely requires a link between the fortunes of the investors and the *efforts* of the promoters. *Mechigian v. Art Capital Corp.,* 612 F.Supp. at 1426. Application of the Fifth Circuit's broader definition of vertical commonality essentially eliminates the "common enterprise" prong of the *Howey* test because the only inquiry required becomes whether the success or failure of the investment is dependent upon the promoter's efforts, which is also the third prong of the *Howey* test. *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1237-38 n. 11 (S.D. N.Y.1981).

■ At least two District Courts in this Circuit have rejected the broad definition of vertical commonality espoused by the Fifth Circuit on the ground that, if the common enterprise component is indeed a full fledged prong of the *Howey* test, it must be given some content distinct from Howey's third prong. *See Mechigian v. Art Capital Corp.,* 612 F.Supp. at 1426; *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. at 1237-38 n. 11 (dictum). This Court agrees and rejects the broad definition of vertical commonality because it negates one of the three prongs of the *Howey* test.

To further complicate this issue, however, some courts view the horizontal and vertical approaches as mutually exclusive, *e.g., Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.2d at 222 ("By adopting [horizontal commonality] we necessarily reject the vertical commonality."), while others do not, *e.g., Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. at 1238 n. 12 ("Under the interpretation that the Court here gives to vertical commonality, no such necessary exclusivity exists."). Moreover, the Second Circuit has not decided which approach—or whether both approaches—should be employed by courts within this Circuit. And, District Court cases confronting the issue within this Circuit have reached varied results. *Compare, e.g., Troyer v. Karcagi,* 476 F.Supp. 1142 (S.D.N.Y.1981) (broad vertical commonality), *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225 (S.D.N.Y.1981) (re-

strictive vertical commonality) *and Darrell v. Goodson,* [1979–80] Fed.Sec.L.Rep. (CCH) ¶ 97,349 (S.D.N.Y.1980) (horizontal commonality). This Court need not reach the issue as there is no common enterprise—and hence no security—under either approach.

■ Horizontal commonality clearly does not exist under the present set of facts because horizontal commonality requires multiple investors whose investments are pooled. *See Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. at 1236–37. Plaintiffs do not allege that any of their funds were pooled with funds of other like investors, nor could they where, as here, plaintiffs are the sole purchasers of a 5% share of their friends' 33⅓ to 50% shares of four real estate investments.

■ Under the Ninth Circuit's restrictive vertical commonality approach, however, a common enterprise may be held to exist within the meaning of *Howey* where there is a one-to-one relationship between the investor and the investment manager *and* the profits and losses of the two parties are somehow interdependent. *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. at 1238; *Brodt v. Bache & Co.,* 595 F.2d 459, 461 (9th Cir.1978) (vertical commonality held not to exist where "the success or failure of [the investment manager] does not correlate with individual investor profit or loss"); *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d at 482 n. 7 (vertical commonality held to exist where the financial arrangement is "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment").

■ It is an important consideration that this one-to-one vertical investment relationship must involve an interdependence of *both profits and losses* of the investment. *See Mechigian v. Art Capital Corp.,* 612 F.Supp. at 1426. This issue typically arises within the context of a broker who can still reap the benefits of commissions and be characterized as successful while the individual accounts are wiped out by losses. In that situation, vertical commonality does not exist because there is no interdependence of both profits and losses. *Mordaunt v. Incomco,* 686 F.2d at 817; *Brodt v. Bache & Co.,* 595 F.2d 459, 461 (9th Cir.1978). In the case presently before the Court, however, the facts differ from that typical situation. Here, the profits of the Kaplans (the investors) are directly tied to those of the Shapiros (the investment managers) in that the Kaplans were to receive 5% of any profits which the Shapiros realized. The Shapiros were not to receive any commissions for managing the Kaplans' investment. However, the Kaplans explicitly claim no liability for losses incurred. Because the Kaplans claim that the terms of their arrangement with the Shapiros precluded the loss of any of their $150,000 investment, it necessarily follows that the Shapiros could lose money on their investment but the Kaplans, who claim the right to the return of their initial investment in any event, could not. Therefore, there is no interdependence of losses, and there can be no vertical commonality as a result. *See Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc.,* 686 F.2d 818, 819 (9th Cir.1982) (No vertical commonality in situations where "the promoter continued to profit through commissions even as the account lost money [or where,] had the account been successful, the promoter would not necessarily have shared the benefits because [the investor] could elect to withdraw profits as they accrued"), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 495 (1983).

This Court finds that plaintiffs' investment cannot be characterized as a common enterprise under the *Howey* test. Because plaintiffs' investment fails Howey's second prong, it cannot be classified as a security within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. As a result, this Court lacks subject matter jurisdiction over plaintiffs' federal claims brought pursuant to those statutes, and those claims must be dismissed.

■ The dismissal of plaintiffs' two federal claims raises a serious issue as to whether this Court should retain jurisdiction over plaintiffs' remaining three claims, which are matters of New York statutory

342

and common law. All parties are citizens of New York, and there is and, indeed could be no allegation that this Court has jurisdiction over plaintiffs' remaining claims by reason of diversity of citizenship. Where, as here, the Court is alleged to have pendent jurisdiction over state law claims by reason of related federal statutory claims, the exercise of pendent jurisdiction after dismissal of the federal claims is a matter of discretion with the Court. *Obolensky v. G.P. Putnam's Sons,* 628 F.Supp. 1552, 1556 (S.D.N.Y.1986) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 727, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). Application of this doctrine requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law. *Federman v. Empire Fire and Marine Insurance Company,* 597 F.2d 798, 809 (2d Cir.1979) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Dismissal of the state claims is the recommended procedure in cases where the federal claim is disposed of prior to trial. *Id.* (citations omitted).

 Plaintiffs argue that, in light of the substantial time and energy that has already been expended in the discovery stages of this litigation, the Court should retain pendent jurisdiction in order to serve the ends of judicial economy, convenience and fairness to the litigants. The Court disagrees. That discovery has been completed here does not mean that, were plaintiffs to bring their state claims in state court, the time spent on discovery in the dismissed federal case would have been wasted as a result. It will simply assist in expediting the state process by obviating the need for additional discovery there. In addition, dismissal of the state claims in the federal suit serves the interests of comity and avoids needless decisions of state law.

Finally, in the interests of fairness to the litigants, the Court has taken into consideration the availability of an alternative forum in which plaintiffs can adjudicate their claims. Plaintiffs will not be precluded from litigating in state court on the basis

that they are time barred to assert these claims as the result of the running of the statute of limitations. Section 203(d) of the New York Civil Practice Law & Rules tolls the state statute of limitations periods during the pendency of federal actions. N.Y. Civ.Prac.L. § 203(d) (McKinney 1972); *Spencer v. Banco Real, S.A.,* 623 F.Supp. 1008, 1014 n. 4 (S.D.N.Y.1985). Accordingly, plaintiffs' remaining claims are dismissed without prejudice for lack of federal subject matter jurisdiction.

*CONCLUSIONS*

Defendants' motion for summary judgment is granted pursuant to Rule 56 of the Federal Rules of Civil Procedure, and the claims are dismissed for lack of federal subject matter jurisdiction.

SO ORDERED.