Nick SAMPSON and Marjorie
Sampson, Plaintiffs,

v.

INVEST AMERICA, INC., Enersave,
Ltd., Inc., and James Malloy,
Defendants.

Civ. A. No. 87–0087–XX.

United States District Court,
D. Massachusetts.

Dec. 12, 1990.

J. Allen Holland, Paul J. Leikhim, Lynch,
Brewer, Hoffman & Sands, Boston, Mass.,
for plaintiffs.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This matter comes before the Court upon the plaintiffs' motion for partial summary judgment pursuant to FED.R.CIV.P. 56. This Court must grant summary judgment under Rule 56(c) if the moving parties show that the record is bereft of any genuine, material factual dispute and that they are entitled to judgment as matter of law. FED.R.CIV.P. 56(c). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Mack v. Cape Elizabeth*, 553 F.2d 720, 722 (1st Cir. 1977); *Medina–Munoz v. RJ Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir.1990). Beyond filing an Answer, Invest America, Inc. ("Invest America") and James Malloy ("Malloy") have not opposed this motion. Enersave Ltd., Inc. ("Enersave") has not even bothered to appear, answer, or contest this action in any way.[1] Thus, if the motion of the plaintiffs Nick and Marjorie Sampson ("the Sampsons") is properly supported by fact and law, then FED.R.CIV.P. 56(e)[2] mandates the entry of judgment in their favor. In their Answer, Invest America and Malloy admit that neither they nor the investments they sold to the Sampsons through the devices of interstate commerce were registered with either the Securities and Exchange Commission or the Secretary of the Commonwealth of Massachusetts. Thus, the broad issue presented to this Court is whether these investment opportunities are investment contracts—thus, securities—as matter of law. The Court proceeds to address this issue upon the basis of the unrebutted evidentiary material before it. Upon this record, the following facts appear undisputed:

From April 1984, until February 1986, Invest America, a California corporation, and Enersave, a Texas corporation, offered to sell and sold units of the Solar Income Program ("Solar")—an investment opportunity—to the general public. Solar's financial matrix was described to potential investors in the following manner.

Investpro Enterprises Inc. ("Investpro"), a Nevada corporation, manufactured solar-powered hot water systems ("Solar units") designed for residential application. Investpro sold the Solar units to Starlite Power, Inc. ("Starlite"), another Nevada corporation. Starlite hired Enersave to serve as "transaction manager" and "equipment broker." Invest America's agents served as Enersave's foot soldiers by meeting with potential investors to deliver a sales pitch which sought not only the sale of Solar units but also the customer's commitment to contract with Starlite as their "full service company." As a full service company, Starlite installed, managed, and leased the Solar units to Nevada homeowners. Under the terms of the investment agreement, investors retained the right to bypass Starlite and install, manage, and lease Solar units themselves. Notwithstanding this facially liberating clause, however, the exercise of this option was highly unlikely. Indeed, the investor was left with no appreciable alternative but to employ Starlite given the Solar units' remoteness from the buyer, the specialized expertise required to manage and install the Solar units, and the practical availability of Starlite's services. Thus, in all likelihood, this transactional path returned to Starlite. The following diagram illustrates the arrangement.

---

**1.** Plaintiffs' Attorney, J. Allen Holland, Esq. advises that, "Defendant Enersave has failed to file an Answer or otherwise defend and is no longer a viable entity. Accordingly, only Defendants Invest America and Malloy are contesting this Motion for Partial Summary Judgment...." Plaintiffs' Memorandum in Support of the Motion of the Plaintiffs for Partial Summary Judgment, p. 2 n. 1.

**2.** FED.R.CIV.P. 56(e) provides in pertinent part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In July 1985, Jason Brown, an Invest America agent, approached Nick Sampson, delivered his sales pitch, provided descriptive brochures and discussed the Sampsons' potential purchase of Solar units. The brochures and Brown's verbal descriptions were consistent with the above-rendered diagram. On August 19, 1985, the Sampsons purchased three Solar units totalling $11,130.00. On December 4, 1985, the Sampsons purchased an additional three units totalling $11,925.00. Not surprisingly, the Sampsons also retained Starlite for a fifteen year term. The August and December transactions were each satisfied by one check—payable to Enersave.

In addition to the duties already mentioned, Starlite, under the terms of its contract with the Sampsons, was responsible for disbursing "revenue"; i.e., the Sampsons were to receive forty dollars per month from Starlite for two consecutive years. This money originated, "from STARLITE's sale to the Homeowner of those parts used to install the Equipment." Then, "from the lease of the Equipment, commencing with the third year, the

[Sampsons] . . . receive[d] $40.00 per month in gross rental income." Property Management Agreement attached as Exhibit A to the Affidavit of Nick Sampson, December 15, 1988. In consideration for Starlite's services, the Sampsons agreed to pay Starlite a "property management fee of ten percent (10%) of the gross revenues from the Equipment." Ibid. Both the purchase of Solar units and Starlite's contract were made in Massachusetts.

In October 1985, Invest America and Enersave offered to sell and sold units of the Enersave Energy Conservation System ("Energy units")—an investment opportunity—to the general public. The one material distinction between Energy units and Solar units was that Energy unit purchasers did not have the "option" to install, manage, and lease the investment themselves. Instead, Energy units were installed by a company chosen by Invest America and Enersave. The Sampsons, in Massachusetts, purchased one Enersave unit totalling $12,190.00.

In December 1985, Invest America and James Malloy ("Malloy") began offering to sell and sold (limited partnership) units of Stanley Manor, Ltd. ("Stanley units"), a Colorado limited partnership engaged in the operation of a resort located in Estes Park, Colorado. During that same month, Malloy gave the Sampsons promotional materials—replete with profit-projections—describing the Stanley units' superior investment potential. On December 30, 1985 the Sampsons, in Massachusetts, purchased four Stanley limited partnership units totalling $120,000.00.

In July 1988, the Sampsons filed their Amended Complaint in the United States District Court for the District of Massachusetts against Invest America, Enersave, and James Malloy alleging numerous federal and state law violations and seeking the rescission of all the transactions discussed above. This Court has jurisdiction over the federal law claims pursuant to 28 U.S.C. section 1331. In its discretion, this Court accepts the state claims asserted by the Sampsons because the, "state and federal claims derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Venue is proper pursuant to 28 U.S.C. § 1391. The Sampsons now move for partial summary judgment as to Counts I, IV, V, IX, X, XI, XII, and XIII of their Complaint.

In Counts I and IX of their Amended Complaint, the Sampsons assert that Invest America and Enersave are securities dealers [3] who, through interstate commerce, sold unregistered, non-exempt securities [4]—specifically, investment contracts—in violation of Sections 5 [5] and 6 [6] of the Securities Act of 1933.[7] In Counts IV, X, and XII of their Amended Complaint, the Sampsons assert that Invest America and Enersave violated Massachusetts General Laws chapter 110A ("the Massachusetts Blue Sky Law") [8] by selling investment contracts in Massachusetts yet failing to register these securities with the Secretary of the Commonwealth of Massachusetts ("the Secretary").[9] In Counts V, XI, and XIII of the Amended Complaint, the Sampsons assert that Invest America and Enersave violated the Massachusetts Blue Sky

---

**3.** 15 U.S.C. § 77b(12) provides:

The term "dealer" means any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person.

**4.** 15 U.S.C. § 77b(1) provides:

The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or, other mineral rights, or in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

**5.** 15 U.S.C. § 77e provides in pertinent part:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of mails to sell such security through the use or medium of any prospectus or otherwise; or
(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale....

**6.** 15 U.S.C. § 77f provides in pertinent part:

(a) Any security may be registered with the [Securities and Exchange] Commission under the terms and conditions hereinafter provided, by filing a registration statement....

**7.** 15 U.S.C. § 77a *et seq.*

**8.** "The term 'blue sky' derives from the fact that such statutes are intended to prevent 'speculative schemes which have no more basis than so many feet of 'blue sky.'" *Manchester Bank v. Connecticut Bank & Trust Co.*, 497 F.Supp. 1304, 1315 n. 8 (D.C.N.H.1980), *quoting Hall v. Geiger–Jones Co.*, 242 U.S. 539, 550, 37 S.Ct. 217, 220, 61 L.Ed. 480 (1917).

**9.** Mass.Gen.Laws ch. 110A § 301 provides in pertinent part:

Registration Requirement
It is unlawful for any person to offer to sell any security in the commonwealth unless

Law by not registering themselves as "broker-dealers" with the Secretary.[10] As to each Count, the Sampsons, pursuant to Section 12 [11] of the Securities Act of 1933 and Section 410 [12] of the Massachusetts Blue Sky Law, request that this Court (1) order Invest America, Enersave, and James Malloy to reimburse the Sampsons for all the Solar units, Energy units, and Stanley units they have purchased; (2) grant incidental and consequential damages in an amount not less than $100,000.00 and; (3) award the Sampsons interest, costs, and attorneys' fees. If the investment opportunities described above are legally "securities" as that term is used in the Securities Act of 1933 and the Massachusetts Blue Sky Law, then the Sampsons are entitled to the first and third aspects of their requested relief upon the undisputed facts.

■ To determine whether these investments are securities, the analysis commences with the three-pronged test elucidated in *Securities and Exchange Commission v. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).[13] Indeed, given the striking factual similarity between the two cases, this Court needn't look much further than *Howey* to hold for the Sampsons. *Howey* defined a security as (1) an investment of money; (2) in a common enterprise; (3) with profits derived solely from the efforts of others. *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–03.

As for the first prong, there can be no doubt that the Sampsons made an investment of money. The apparent snag encumbering the third prong is overcome by a careful reading of Mr. Justice Murphy's majority opinion. Briefly stated, the facts in *Howey* involved two co-managed Florida corporations, W.J. Howey Company and Howey-in-the-Hills Service, Inc., which cultivated, harvested, and marketed oranges. Investors in this scheme owned orange grove parcels. These parcels were sold through a land sales contract. *Howey*, 328 U.S. at 294–95, 66 S.Ct. at 1100–01. As a condition precedent to contract formation, the investor was required to hire a "service company" to farm her investment. While the investors in *Howey* were—as were the Solar unit investors—free to choose which service company they employed, the superiority of Howey-in-the-Hills was stressed. *Howey*, 328 U.S. at 295, 66 S.Ct. at 1101. This did not affect the *Howey* Court—who considered this "transfer of rights" to be "purely incidental" when the offer is made, "to persons who reside in distant localities and who lack the equipment and expertise requisite for the [investment's ripening]. Such persons have no desire to occupy the

(1) it is registered under this chapter. . . .

10. Mass.Gen.Laws ch. 110A, § 401 provides in pertinent part:
> (c) "Broker-dealer" means any person engaged in the business of effecting transactions in securities for the account of others for or his own account. . . .
> Mass.Gen.Laws ch. 110A, § 201 provides in pertinent part:
> (a) It is unlawful for any person to transact business in the commonwealth as a broker-dealer or agent unless he is registered under this chapter.

11. 15 U.S.C. § 77*l* provides in pertinent part:
> Any person who:
> (1) offers or sells a security in violation of Section 77e of this title. . . . shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of

such security, or for damages if he no longer owns the security.

12. Mass.Gen.Laws ch. 110A, § 410 provides in pertinent part:
> (a) Any person who
> (1) offers or sells a security in violation of section 201(a), 301, or 405(b), or of any rule or order under Section 403 which requires the affirmative approval of sales literature before it is used, or of any condition imposed under Section 303(d), or . . .
> (2) . . . is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs and reasonable attorneys' fees. . . .

13. Because the definition of "security" under the Massachusetts Blue Sky Law is almost identical to that under the Securities Act of 1933, as a matter of statutory interpretation, decisions under the federal Act should be used as guidance in construing the state act. *Valley Stream Teachers Federal Credit Union v. Commissioner of Banks*, 376 Mass. 845, 857–58, 384 N.E.2d 200 (1978).

land or to develop it themselves; they are attached solely by the prospects of a return on their investment." *Howey,* 328 U.S. at 299–300, 66 S.Ct. at 1103.

The *Howey* majority, in ruling that the investments were investment contracts, instructed that substance outweighs form—that the analysis should focus on the "economic reality." *Howey,* 328 U.S. at 298, 66 S.Ct. at 1102. *Howey* dicta explains that the three-pronged test, "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103. The investor's choice of service company was undeterminative since an offer alone is sufficient to trigger the relevant statute's application. *Howey,* 328 U.S. at 300–01, 66 S.Ct. at 1103–04. *See also Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) ("The Supreme Court has rejected [a] literal approach ... and has consistently counseled that the application of the federal securities statute turns on the economic realities underlying a transaction"); *Manchester Bank v. Connecticut Bank & Trust Co.,* 497 F.Supp. 1304, 1311 (D.N.H.1980), *citing United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). Accordingly, given the "economic reality" in the present case—that Solar and Energy unit purchasers were offered (and no doubt accepted) Starlite's services—this Court rules that the undisputed facts satisfy the third prong of the *Howey* test.

The most difficult issue in the present case is whether the facts satisfy the second prong of the *Howey* test: the "common enterprise." The First Circuit has not spoken on this issue and the Circuit Courts are split. *Compare Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.1972) and *Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 622 F.2d 216, 222 n. 5 (6th Cir.1980) (cases collected), *aff'd on other grounds,* 453 U.S. 925, 102 S.Ct. 884, 69 L.Ed.2d 1020 (1982) (espousing a "horizontal commonality" or a pooling of investors' interests) *with Securities and Ex-*change Commission v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir.1974) (applying the "broad vertical" test which merely requires a link between the investor's fortunes and the promoter's efforts).

Four judges in this District, however, have adopted the compromise position—the "narrow vertical" approach. *Holtzman v. Proctor, Cook & Co., Inc.,* 528 F.Supp. 9, 14–16 (D.Mass.1981) (McNaught, J.); *Kaufman v. Magid,* 539 F.Supp. 1088, 1096–97 (D.Mass.1982) (Tauro, J.); *Schofield v. First Commodity Corp. of Boston,* 638 F.Supp. 4, 7 (D.Mass.1985) (Zobel, J.), *aff'd on other grounds,* 793 F.2d 28 (1st Cir.1986); *Gaudette v. Panos,* 644 F.Supp. 826, 834 (D.Mass.1986) (Caffrey, J.), *modified on other grounds,* 650 F.Supp. 912 (D.Mass.1987). The uniform application of this approach in this District is persuasive authority for its application here.

The "narrow vertical" approach was first explicated by the Ninth Circuit in *Securities and Exchange Commission v. Glenn Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). It was later refined in *Brodt v. Bache & Co.,* 595 F.2d 459, 461 (9th Cir.1978), and appears to be followed uniformly not only in this District but by the Southern District of New York. *See Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1238 (S.D.N.Y.1981); *Kaplan v. Shapiro,* 655 F.Supp. 336, 340–41 (S.D.N.Y.1987). Satisfaction of the "narrow vertical" approach requires "the broker's fortunes are tied directly to the investor's success." *Schofield,* 638 F.Supp. at 7. *See also Kaufman v. Magid,* 539 F.Supp. at 1097 (requiring an "interdependence between the fortunes of the investor and the profits of the broker"); *Holtzman v. Proctor, Cook & Co., Inc.,* 528 F.Supp. at 15, 16 (requiring an "interdependence" between the broker's and investor's profits and losses); *Gaudette v. Panos,* 644 F.Supp. at 834 (requiring that defendant broker's fortunes be "tied directly to the plaintiffs' success as investors").

This Court rules that the success of the Sampsons' investment and the fortunes of

Enersave and Invest America are directly tied and are interdependent so as to satisfy the narrow vertical approach to the "common enterprise" factor. In the present case, the homeowner lessee sends all payments to Starlite. Starlite, in turn, sends a portion of these monies to the investor; here the Sampsons. The contract explains that this revenue derives from two sources. First—for a period of two years—the Sampsons are to receive a forty dollar monthly payment resulting from the sale of parts incident to the Solar unit's installation. If Starlite fails to lease the Solar units or if the customer defaults on her obligation to pay for these parts, then the source of this revenue evaporates and the Sampsons cannot, by the terms of their contract, receive this revenue. The Sampsons' second source of revenue also depends for its existence on the success of Starlite's ability to find (and collect money from) lessees. This revenue—forty dollars of gross rental income per month—is sent to the investor at the commencement of the lease's third year. Thereafter, the payments increase by ten percent annually.

Enersave and Invest America are employed by Starlite to sell Starlite's Solar units. Their income derives from commissions paid to them by Starlite. Without lease payments from lessees, Starlite's ability to purchase new units from Investpro and maintain the agency costs of Enersave and Invest America would diminish precipitously. Minus the equipment to broker, the transactions to manage, and the commissions to earn, the fortunes of Enersave and Invest America vanish in proportion to Starlite's fiscal misfortune. Conversely, the more units Enersave and Invest America sell, and the more units Starlite leases, then the greater the revenue for investor and broker alike.

Therefore, because the respective fortunes of Enersave, Invest America, and the Sampsons exhibit this interdependence, this Court rules that they are engaged in a narrow vertical "common enterprise" so as to satisfy the definition of security under *Howey*. Accordingly, Solar units and Energy units are unregistered, non-exempt securities sold through the devices of interstate commerce. That being so, the Sampsons are entitled to rescind all six Solar unit purchases (totalling $22,425.00) and the Enersave unit purchase (which totalled $12,190.00).

■ This Court also holds that the Stanley units are securities. The *Howey* test is easily satisfied here. First, the Sampsons invested money when they purchased four Stanley units for $120,000.00. Second, the respective fortunes of the managing general partner and the Sampsons are directly tied or are interdependent. The profitability of the Stanley Manor House depends solely on the general partner's capacity in attracting tourists and running a tight ship. The general partner's income and the return on the Sampsons' investment depend on the profitability of the Stanley Manor House. Thus, a "common enterprise" exists. Finally, the Sampsons expected profits to derive solely from the efforts of others since only the general partner managed the resort's affairs. Stanley units satisfy each element of the *Howey* test and, accordingly, are securities.

■ While the general partner legally claimed exemption pursuant to Section 4(2)[14] of the Securities Act of 1933, this exemption does not affect Invest America's and James Malloy's duty to: (1) register themselves as broker-dealers with the Secretary as is required by Section 401(c) of the Massachusetts Blue Sky Law, or (2) register Stanley units as exceptions under Section 301 et seq.[15] or Section 402[16] of that law. Therefore, the Sampsons are entitled to rescind the transaction and re-

14. 15 U.S.C. § 77d provides in pertinent part:
   The provisions of 77e of this title shall not apply to— ...
   (2) transactions by an issuer not involving any public offering.

15. *See supra* note 9 and accompanying text.

16. Mass.Gen.Laws ch. 110A, § 402 provides in pertinent part:
   (d) In any proceeding under this chapter, the burden of proving an exemption or an exception from a definition is upon the person claiming it.

cover $120,000.00. The Massachusetts Blue Sky Law also entitles them to costs and a reasonable attorney's fee.[17] As there is no adequate evidence of consequential and incidental damages in the amount of "not less than $100,000.00", so much of the motion for partial summary judgment as seeks such relief is denied.

The entire record is bereft of any material, factual dispute and the Sampsons are entitled to judgment on the counts in question as matter of law. The Sampsons' partial summary judgment motion is, therefore, ALLOWED.

A brief postscript appears to be in order. Granting this motion for partial summary judgment would seem likely, as a practical matter, to bring this case to a close. After all, the Sampsons are now entitled to judgment for the full amount of their several investments, costs, and a reasonable attorney's fee. True, the remaining fraud and racketeering counts hold the potential for an additional damage award but, as there is here no reason to enter a separate, partial judgment under FED.R.CIV.P. 54(b), some time will pass before these remaining counts can be brought to trial and a final judgment entered. Given the apparently evanescent nature of these defendants, the further passage of time bears a directly inverse relationship to the practical likelihood of actually satisfying the judgment for the Sampsons which will ultimately enter. Accordingly, in aid of proper judicial administration and to focus the attention of the parties and counsel on the matters just discussed, it is ORDERED:

1. Within ten days of the date of this order, counsel for the plaintiffs shall file a detailed proof of the claim for attorney's fees, making service by mail on all other parties.

2. Unless counsel for the plaintiffs objects in writing before the expiration of thirty days from the date of this order, the remaining counts will be dismissed with prejudice and judgment for the plaintiffs shall enter on that day in accordance with the terms of this opinion plus costs and a reasonable attorney's fee.

17. *See supra* note 12 and accompanying text.

3. Should the objection referred to in paragraph two immediately above be timely filed, no judgment shall enter at this time and the case will be scheduled for a prompt trial in Worcester.